Moheb A. H. al SADAT,
Plaintiff-Appellant,

v.

Heinz MERTES, and Hartford Accident
& Indemnity Co., a Foreign Corpora-
tion, Defendants-Appellees,

and

Daniel E. GALGANITES and Badger State
Mutual Casualty Co., Defendants-Third-
Party Plaintiffs-Appellees,

v.

GENERAL CASUALTY COMPANY OF
WISCONSIN, a domestic corporation
and Lloyd W. Hahn, d/b/a Lloyd's Texa-
co, Third-Party Defendants-Appellees.

No. 79–1357.

United States Court of Appeals,
Seventh Circuit.

Submitted Jan. 16, 1980.*

Decided Feb. 19, 1980.

* After preliminary examination of the briefs, the court notified the parties that it had tentatively decided that oral argument was unnecessary. The notice provided that any party could file a "Statement as to Need of Oral Argument." *See* Fed.R.App.P. 34(a); Circuit Rule 14(f). No party filed such a statement. Upon consideration of the briefs and the record, the appeal is submitted for decision without oral argument.

Joseph W. Weigel, Andrew L. Hunsick, Milwaukee, Wis., for plaintiff-appellant.

William P. Croke, Kurt H. Frauen, Milwaukee, Wis., for defendants-appellees.

Victor C. Harding, Milwaukee, Wis., for third-party defendants-appellees.

Before CUMMINGS, PELL and CUDAHY, Circuit Judges.

PER CURIAM.

The plaintiff-appellant, Moheb A. H. al Sadat, appeals from the judgment of the district court dismissing his complaint for want of subject matter jurisdiction. The plaintiff challenges the district court's judgment on three alternative grounds, any one of which, if sustained, would require a reversal of the judgment. The appellant first attacks the district court's finding that the plaintiff was not a domiciliary of the State of Pennsylvania and therefore not a citizen of a state within the meaning of 28 U.S.C. § 1332(a)(1). Second, the plaintiff questions the district court's holding that the plaintiff, a naturalized citizen of the United

States, could not also claim to be a citizen of Egypt and hence a citizen or subject of a foreign state within the meaning of 28 U.S.C. § 1332(a)(2). Finally, the plaintiff urges that the defendants should be estopped from raising the issue of the district court's subject matter jurisdiction because the issue was raised after the statute of limitations had run on the plaintiff's cause of action.

## I. The District Court's Judgment

This action arose in the federal district court upon the filing of the plaintiff's complaint on June 7, 1976. The complaint sought damages for injuries allegedly sustained by the plaintiff in an accident between automobiles operated by defendants Mertes and Galganites. Also joined as parties defendant were Hartford Accident & Indemnity Co. and Badger State Mutual Casualty Co., insurers of the automobiles involved in the collision. The plaintiff's complaint alleged negligence on the part of both Mertes and Galganites and sought damages totaling one million dollars. Defendants Hahn and General Casualty Co. of Wisconsin were joined as third party defendants upon the complaint of Galganites and Badger State.

The plaintiff's complaint posited the district court's jurisdiction upon "diversity of citizenship." The complaint alleged that the plaintiff was "an adult citizen of the United States presently residing at Villa el Sadat, 291 Street Cairo New Maadi, A.R. Egypt." The named defendants were alleged to be citizens of either Wisconsin or Connecticut. Despite the defect in the jurisdictional statement apparent on the face of the complaint, see Part III *infra,* no motion challenging the court's jurisdiction over the subject matter was filed until January 23, 1979. At that time the third party defendants moved that the action be dismissed. The motion maintained that because the plaintiff was not domiciled in the United States at the time his complaint was filed, he was not a "citizen of a state" within the meaning of 28 U.S.C. § 1332(a)(1). The other defendants later

joined in this motion. The plaintiff responded by an affidavit stating that although he resided in Egypt on June 7, 1976, his domicile was Pittsburgh, Pennsylvania. Alternatively, the plaintiff averred that in 1976 he was a citizen of Egypt as well as of the United States. Therefore, the plaintiff suggested that jurisdiction existed under 28 U.S.C. § 1332(a)(2), and he requested leave to amend his complaint accordingly.

The district court granted the motion to dismiss. *Sadat v. Mertes,* 464 F.Supp. 1311 (E.D.Wis.1979). Upon consideration of the record including depositions which had been taken of the plaintiff, the district court found that the plaintiff was domiciled in Egypt when the action was commenced. Therefore, the court held, that although the plaintiff was a citizen of the United States, he was not a citizen of a state able to invoke the provisions of 28 U.S.C. § 1332(a)(1). In response to the plaintiff's second argument in support of the court's jurisdiction, the district court held that a naturalized citizen of the United States could not rely on his dual nationality to bring suit under 28 U.S.C. § 1332(a)(2).

## II. The Plaintiff's Travels and Travails

An understanding of the jurisdictional dilemma facing the plaintiff requires a review of his wanderings over the last several decades. The plaintiff was born in Egypt, received his early schooling there, and apparently served in the Egyptian armed forces as a young man. He left his homeland during the 1950s and studied in Europe and worked in Kuwait before coming to the United States in 1963. While in the United States and prior to the events at issue here, he continued his education at several universities and at various times worked for several corporations. In 1973, he apparently was domiciled in Pittsburgh, Pennsylvania. He owned a home there; his wife worked for the University of Pittsburgh; and his children apparently attended the local schools there.

1973 was an eventful year for the plaintiff. With the permission of the government of Egypt he became a naturalized

citizen of the United States. He also received an offer from Kohler International Ltd. to serve as the corporation's Area Manager for the Middle East. The job required the plaintiff, after a brief training period at the corporation's offices in Wisconsin, to relocate to Beirut, Lebanon. The plaintiff accepted the offer. His wife left her position with the university. He sold his house and began to move his family and personal property to Lebanon. On his way to O'Hare International Airport from Kohler's Wisconsin offices, the plaintiff was involved in the automobile accident giving rise to his complaint here. He nevertheless completed his move to Beirut and, once there, notified the U. S. Embassy that Beirut was his permanent overseas residence.

Mr. Sadat and his family stayed in Beirut for about two years. On April 15, 1975, apparently as a result of mutual dissatisfaction complicated by the political unrest in Lebanon, the plaintiff and his employer terminated their association with each other. On June 25th, Kohler and the plaintiff executed a mutual release. In consideration of the plaintiff's release of all employment related claims against it, Kohler agreed, *inter alia*, to release its claims against the plaintiff and to

> pay the actual cost of transporting Mr. Sadat and his wife and children, including

reasonable expenses incidental to such transporting, as well as Mr. Sadat's household furnishings and personal property, from Lebanon to the United States or other location specified by Mr. Sadat; provided, however, that in any event such sum paid shall not exceed the cost of transportation to Pittsburgh, Pennsylvania; and provided further, that Mr. Sadat notifies Company prior to transportation and accomplishes said transportation as promptly as is reasonable, but in no event later than December 31, 1975.

Around this time, according to the plaintiff's deposition, he and his family made a hurried departure from Lebanon. Intense fighting had broken out in the streets and the plaintiff therefore moved to the nearest safe place he could bring his family: Alexandria, Egypt.

After the plaintiff's move to Egypt, he stayed in Cairo for several years. According to the plaintiff, Kohler refused to honor its commitment to pay for transportation for him and his family to the location of his choice.[1] He claimed he was financially unable to transport himself or his family back to the United States.[2] He also was unable to obtain employment in Egypt, and, in the interim, he and his family resided in a house in Cairo that his mother purchased for him and he registered with the U.S. Embassy as

---

1. This allegation is the subject of another lawsuit initiated by the plaintiff in the Eastern District of Wisconsin. In *Sadat v. Kohler International Ltd.*, Judge Gordon, relying on Judge Warren's opinion in this case, dismissed the plaintiff's complaint for want of jurisdiction. The plaintiff has also appealed that disposition to this court in No. 79–1535 which we affirm today in an unpublished order.

2. Q. Then when you moved to Cairo, did you fill out any document declaring Cairo as your permanent residency?
   A. Yes I did, in the American Embassy in Cairo.
   Q. And you so intended that Cairo be your permanent residency at the time?
   A. At that time you had to do that immediately when you moved to a new area. You had to report yourself that you are within the jurisdiction of this embassy, whether you like it or not, and you tell them when you intend to stay whether it is for—are you just staying there for a little while.

Q. All right. Did you intend to stay there for a little while?
A. Yes, I did.
Q. For how long?
A. Until I can get the Kohler Company to send—to move me up to the United States.
Q. So you intended to stay in Cairo for an indefinite period, is that correct?
A. I was compelled to.
Q. Because of Kohler Company?
A. Yes, because of their not keeping their word and moving me to the United States, and my family.
Q. But, you intended to remain there until Kohler paid your way back to the United States, is that correct?
A. I told you I didn't intend to. I was compelled to because of the financial difficulty that I was in.
Q. So, you didn't want to be a resident of Cairo?
A. Not really, no.

a permanent resident. Documents submitted by the plaintiff indicate that he was issued Egyptian driver's licenses, paid the real estate taxes on the home, and maintained a checking account in Cairo during this time. In 1978, the plaintiff returned to the States and is now residing in Milwaukee.

### III. Was the Plaintiff a Citizen of any of the United States?

■ The plaintiff's travels over time have been many, but this court's inquiry must center on his status at the time of the commencement of this action. As the district court noted, that is the time at which the jurisdiction of the court is determined. *Smith v. Sperling*, 354 U.S. 91, 93 n.1, 77 S.Ct. 1112, 1113 n.1, 1 L.Ed.2d 1205 (1957).[3] The plaintiff's status of June 7, 1976, therefore determines the capacity in which he brings this suit.

■ 28 U.S.C. § 1332(a)(1) creates the federal courts' jurisdiction over actions between "citizens of different States." For a natural person to fall within the provision he must be both (1) a citizen of the United States and (2) a citizen of a particular state. *See Scott v. Sandford*, 60 U.S. (19 How.) 393, 405–06, 15 L.Ed. 691 (1857); *Delaware, L. & W. R. Co. v. Petrowsky*, 250 F. 554, 557 (2d Cir.), *cert. denied*, 247 U.S. 508, 38 S.Ct. 427, 62 L.Ed. 1241 (1918). It is not disputed here that the plaintiff having been naturalized in 1973 is a citizen of the United States. What is contested is whether in 1976 when his complaint was filed he was a citizen of one of the United States. The issue is crucial to the plaintiff's claim of jurisdiction under 28 U.S.C. § 1332(a)(1) because settled precedent establishes that a citizen of the United States who is not also a citizen of one of the United States may not maintain suit under that section. *Mey-*

*ers v. Smith*, 460 F.Supp. 621 (D.D.C.1978); *Kaufman & Broad, Inc. v. Gootrad*, 397 F.Supp. 1054 (S.D.N.Y.1975); *Garner v. Pearson*, 374 F.Supp. 580, 588–90 (M.D.Fla. 1973); *Hernandez v. Lucas*, 254 F.Supp. 901 (S.D.Tex.1966); *Clapp v. Stearns & Co.*, 229 F.Supp. 305 (S.D.N.Y.1964); *McClanahan v. Galloway*, 127 F.Supp. 929 (N.D.Cal.1955); *Alla v. Kornfeld*, 84 F.Supp. 823 (N.D.Ill. 1949); *Hammerstein v. Lyne*, 200 F. 165 (W.D.Mo.1912). Although this doctrine excluding Americans domiciled abroad from the federal courts has been questioned,[4] the plaintiff does not directly attack it here and we see no reason for upsetting settled law now.

■ State citizenship for the purpose of the state diversity provision is equated with domicile. The standards for determining domicile in this context are found by resort to federal common law. *Stifel v. Hopkins*, 477 F.2d 1116, 1120 (6th Cir. 1973); *Ziady v. Curley*, 396 F.2d 873, 874 (4th Cir. 1968). To establish a domicile of choice a person generally must be physically present at the location and intend to make that place his home for the time at least. *See* Restatement (Second) of Conflict of Laws §§ 15, 16, 18 (1971). Applying these standards, the district court found that the plaintiff was domiciled in Egypt in 1976. The plaintiff, however, contends that he should be considered a domiciliary of the State of Pennsylvania. He apparently bases his claim upon his previous domicile there in 1973 and his alleged intention to return there upon leaving Lebanon in 1975. "Unfortunately," the plaintiff's brief opines, "the successive events required [him] to move from Beruit, [*sic*] Lebanon to Cairo, Egypt and to take up residence there until he was able to return to the United States in 1978."

---

**3.** Thus the plaintiff's return to the United States and settlement in Wisconsin in 1978 do not oust the court of any jurisdiction that it may have had. *See Morgan's Heirs v. Morgan*, 15 U.S. (2 Wheat.) 290, 4 L.Ed. 242 (1817).

**4.** *See* Currie, *The Federal Courts and the American Law Institute*, 36 U.Chi.L.Rev. 1, 9–10 (1968) (suggesting that Americans abroad

might reasonably be deemed foreign subjects); Comment, 19 Wash. & Lee L.Rev. 78, 84–86 (1962) (proposing that a person's domicile and therefore his state citizenship should be deemed to continue until citizenship is established in another of the United States or until American citizenship is abandoned).

■ The plaintiff's deposition testimony makes clear that his move from Pennsylvania to Lebanon in 1973 effected a change in his domicile. He moved his belongings, his family, and his business to Lebanon. Then, in 1975 he moved again to Egypt where he and his family stayed through 1976, the year of the filing of his complaint. The plaintiff's affidavit in opposition to the defendants' motion to dismiss states that he "owns his home in Cairo, Egypt and considers himself a resident of Egypt where he was born and raised [and] that he maintains said home in Cairo, Egypt, which home contains his furniture, books, records and valuables." He also sent his children to school there and secured Egyptian driver's licenses there. This evidence was sufficient to permit the district court to find that the plaintiff was domiciled in Egypt notwithstanding his assertion that he never intended to make Egypt his home.[5] Although the plaintiff disclaimed any intention of settling in Cairo, "[i]ntent is a state of mind which must be evaluated through the circumstantial evidence of a person's manifested conduct." *Berhalter v. Irmisch*, 75 F.R.D. 539, 541 (W.D.N.Y.1977), and "statements of intent are entitled to little weight when in conflict with the facts," *Garner v. Pearson*, 374 F.Supp. 580, 589 (M.D.Fla.

1973). *See also Tanzymore v. Bethlehem Steel Corp.*, 325 F.Supp. 891, 894 (E.D.Pa. 1971), *aff'd*, 457 F.2d 1320 (3d Cir. 1972).

But even if the district court's conclusion that the plaintiff intended to make Egypt his home was erroneous, *cf.* Restatement (Second) of Conflict of Laws § 17, comment *f* (1971), that does not establish that Pennsylvania was the plaintiff's domicile. It only leads to the conclusion that Lebanon was. "A domicil once established continues until it is superseded by a new domicil." *Id.* at § 19. The plaintiff never returned to Pennsylvania after leaving for Lebanon in 1973 and thus never established the physical presence necessary to reestablish his domicile there. Moreover, his claimed intention to return to that state, assuming *arguendo* that in these circumstances intention alone would be sufficient to establish a new domicile, is refuted by the facts. First, the contract providing for Kohler to pay his moving expenses, contrary to his assertion in his brief, did not specify Pittsburgh as his destination. It gave the plaintiff his choice of destinations and provided that reimbursement would not exceed the cost of relocating the plaintiff to Pittsburgh. Second, the plaintiff's own deposition testimony indicates that his intention to return to Pennsylvania was less than firm.[6] The

---

5. The plaintiff apparently did vote in the 1976 presidential elections by an absentee ballot sent to him from Pennsylvania. A party's voting practice, however, is only one of the factors considered in determining that person's domicile. No single factor is conclusive. 15 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3612 at 717 (1975).

6. Q. So however it happened, you parted company because you wanted to leave Beirut because it was too dangerous and they wouldn't let you do that?
A. It was obvious.
Q. Now, was it then that you wanted to come to California?
A. Yes.
Q. To Los Angeles?
A. Yes.
Q. And what were you going to California for?
A. Well, I'm first generation American, so is my family. And we have no preference whether it's Wisconsin or it's—only for the warmth of climate or better climate for my state of health. That we be better there.

Q. Okay. Your reason for going to Los Angeles was just because you like the climate?
A. It's not because I like, because it would be better for my health. And I have no preference in the United States. I mean, I don't have any relatives that I would go to when I come here.
Q. Do you still have plans to go to Los Angeles or California?
A. Yes.
Q. When do you plan to do that?
A. Whenever I have the financial capability.
Deposition of the Plaintiff, December 30, 1976, at 95–96.
Q. All right. At that point, were you ever going to go back to Pittsburgh? Did you ever have any reason to go back to Pittsburgh?
A. Well, Pittsburgh is just the same like any other city for me. I am first generation American, as well as my family. For me, Pittsburgh or any other place in the United States is my country. I can live any place I so please.

\* \* \* \* \* \*

compulsion which kept the plaintiff in Egypt was a financial one. Arguably, it may have prevented him from forming the intent to make Egypt his home, but it did not establish that his domicile was in one of the United States. Because the plaintiff, an American citizen, was domiciled abroad in 1976, he was not a citizen of a state within the meaning of 28 U.S.C. § 1332(a)(1). The jurisdiction of the district court, if it exists, must be found under 28 U.S.C. § 1332(a)(2).

### IV. Is the Plaintiff a Citizen or Subject of a Foreign State?

The plaintiff's second argument is that if he is not a citizen of one of the United States, then he is by virtue of his dual American-Egyptian citizenship a citizen of a foreign state and jurisdiction therefore exists under 28 U.S.C. § 1332(a)(2). The defendants seem to argue in response that, first, the plaintiff is not an Egyptian citizen, and second, that even if Egypt considers the plaintiff one of its citizens, the plaintiff can only be regarded as an American for purposes of 28 U.S.C. § 1332(a).

28 U.S.C. § 1332(a)(2) vests the district courts with jurisdiction over civil actions between state citizens and citizens of foreign states. This power is sometimes referred to as alienage jurisdiction. Although the basis for alienage jurisdiction is similar to that over controversies between state citizens, it is founded on more concrete concerns than the arguably unfounded fears of bias or prejudice by forums in one of the United States against litigants from another of the United States.

> A. There is no preference since I have no relatives here or in Pittsburgh. It really is the same wherever I am.
> Q. So when you get a new job and you move to that new job, that becomes your new home then, is that correct?
> A. Yeah, if you say I have loyalty, I don't have loyalty to a certain state in that manner. But, my kids are loyal to Pennsylvania. They grew up there. They grew up there. They are favorites to the Pirates and all those things. I came in the United States as a grown-up, so it is a little different for me.
> Deposition of the Plaintiff, December 19, 1978, at 30–32.

The dominant considerations which prompted the provision for such jurisdiction appear to have been:

(1) Failure on the part of the individual states to give protection to foreigners under treaties; Farrand, "The Framing of the Constitution" 46 (1913); Nevins, "The American State During and After the Revolution" 644–656 (1924); Friendly, 41 Harvard Law Review 483, 484.

(2) Apprehension of entanglements with other sovereigns that might ensue from failure to treat the legal controversies of aliens on a national level. Hamilton, "The Federalist" No. 80.

*Blair Holdings Corp. v. Rubinstein*, 133 F.Supp. 496, 500 (S.D.N.Y.1955). Thus, alienage jurisdiction was intended to provide the federal courts with a form of protective jurisdiction over matters implicating international relations where the national interest was paramount. *See* The Federalist No. 80 (A. Hamilton) ("[T]he peace of the WHOLE ought not to be left at the disposal of a PART. The Union will undoubtedly be answerable to foreign powers for the conduct of its members. And the responsibility for an injury ought ever to be accompanied with the faculty for preventing it.")[7] Recognizing this obvious national interest in such controversies, not even the proponents of the abolition of diversity jurisdiction over suits between citizens of the several United States have advocated elimination of alienage jurisdiction. *See, e. g.,* H. Friendly, Federal Jurisdiction: A General View 149–50 (1973); Rowe, *Abolishing Diversity Jurisdiction: Positive Side Effects*

---

7. *See also* American Law Institute, Study of the Division of Jurisdiction Between State and Federal Courts 108 (1969):

> It is important in the relations of this country with other nations that any possible appearance of injustice or tenable ground for resentment be avoided. This objective can best be achieved by giving the foreigner the assurance that he can have his cases tried in a court with the best procedures the federal government can supply and with the dignity and prestige of the United States behind it.

*and Potential for Further Reforms*, 92 Harv.L.Rev. 963, 966–68 (1979).

█ Because alienage jurisdiction is founded on the fear of giving offense to foreign countries, the domicile of the foreigner is irrelevant. Indeed, an alien domiciled in one of the United States is afforded access to the federal courts under 28 U.S.C. § 1332(a)(2) even when he sues an American citizen residing in the same state. *See C. H. Nichols Lumber Co. v. Franson*, 203 U.S. 278, 27 S.Ct. 102, 51 L.Ed. 181 (1906); *Breedlove v. Nicolet*, 32 U.S. (7 Pet.) 413, 431–32, 8 L.Ed. 731 (1833); *Psinakis v. Psinakis*, 221 F.2d 418, 422 (3d Cir. 1955); *City of Minneapolis v. Reum*, 56 F. 576 (8th Cir. 1893); *Hagl v. Jacob Stern & Sons*, 396 F.Supp. 779, 782 (E.D.Pa.1975). *See also DeVries v. Starr*, 393 F.2d 9, 11 (10th Cir. 1968) (alien domiciled in Spain but a citizen of the Netherlands). The jurisdictional grant in 28 U.S.C. § 1332(a)(2), however, does not establish the federal courts as forums for all lawsuits with an international flavor. Suits solely between aliens are outside the constitutional grant of judicial power. *Jackson v. Twentyman*, 27 U.S. (2 Pet.) 136, 7 L.Ed. 374 (1829); *Hodgson v. Bowerbank*, 9 U.S. (5 Cranch) 303, 3 L.Ed. 108 (1809). Jurisdiction will not lie if the basis for jurisdiction is the alienage of a person with no nationality. *Shoemaker v. Malaxa*, 241 F.2d 129 (2d Cir. 1957); *Factor v. Pennington Press, Inc.*, 238 F.Supp. 630 (N.D.Ill.1964). And an American citizen domiciled abroad is not by virtue of that fact alone a citizen of a foreign state. *Smith v. Carter*, 545 F.2d 909 (5th Cir.), *cert. denied*, 431 U.S. 955, 97 S.Ct. 2677, 53 L.Ed.2d 272 (1977); *Pemberton v. Colonna*, 290 F.2d 220 (3d Cir. 1961) (per curiam) (affirming 189 F.Supp. 430 (E.D.Pa.1960)); *Haggerty v. Pratt Institute*, 372 F.Supp. 760 (E.D.N.Y.1974); *Van der Schelling v. U. S. News & World Report, Inc.*, 213 F.Supp. 756 (E.D.Pa.), *aff'd*, 324 F.2d 956 (3d Cir. 1963) (per curiam), *cert. denied*, 377 U.S. 906, 84 S.Ct. 1166, 12 L.Ed.2d 177 (1964);

*Hammerstein v. Lyne*, 200 F. 165, 171–72 (W.D.Mo.1912).

█ The generally accepted test for determining whether a person is a foreign citizen for purposes of 28 U.S.C. § 1332(a)(2) is whether the country in which citizenship is claimed would so recognize him. This is in accord with the principle of international law that "it is the inherent right of every independent nation to determine for itself, and according to its own constitution and laws, what classes of persons shall be entitled to its citizenship." *United States v. Wong Kim Ark*, 169 U.S. 649, 668, 18 S.Ct. 456, 464, 42 L.Ed. 890 (1898). *See, e. g., Murarka v. Bachrack Bros.*, 215 F.2d 547, 553 (2d Cir. 1954) (Harlan, J.) ("It is the undoubted right of each country to determine who are its nationals, and it seems to be general international usage that such a determination will usually be accepted by other nations"); *Blair Holdings Corp. v. Rubinstein*, 133 F.Supp. at 499. *See also* Restatement (Second) of the Foreign Relations Law of the United States § 26 (1965).

█ Relying on this principle, the plaintiff maintains that notwithstanding his U.S. naturalization, Egypt still regards him as an Egyptian citizen. The evidence in the record tends to sustain his contention. It is apparently the plaintiff's position that Egypt requires its nationals to obtain its consent to their naturalization in other countries and even then it may condition its consent so that the emigrant retains his Egyptian nationality despite his naturalization elsewhere. A letter from the Egyptian Consulate General in New York confirms that the consent of that government is required.[8] Although the plaintiff did obtain the Egyptian government's consent prior to his naturalization in the United States, that consent was apparently conditioned upon his retaining his Egyptian citizenship. A letter from the Egyptian Minister of Exterior to the plaintiff states:

---

8. This is to certify that the Egyptian government does not have any objections for their citizens to officially apply for American citizenship provided that they have no standing criminal records, no financial liabilities to the government, have served in the military service and seek the permission of the Egyptian Government beforehand.

Greetings, we have the honor to inform you that it has been agreed to permit you to be naturalized with United States Citizenship but retaining your Egyptian citizenship and this is according to a letter from the Minister of Interior Department of Travel Documents, Immigration and Naturalization # 608 KH File # 100/41/70, Dated January 24, 1971.

Thus, Egypt still regards the plaintiff as one of its citizens notwithstanding its consent to his naturalization in the United States. In 1978, for example, the Egyptian government issued the plaintiff an Egyptian driver's license and an international driver's license. Both documents show the plaintiff's nationality as Egyptian.

This evidence is sufficient to establish that, despite his naturalization in the United States, the plaintiff is an Egyptian under that country's laws. Consequently, under the ordinary choice of law rule for determining nationality under 28 U.S.C. § 1332(a)(2) he would be so regarded for the purpose of determining the district court's jurisdiction over the subject matter. Thus, the issue squarely presented to this court is whether a person possessing dual nationality, one of which is United States citizenship,[9] is "a citizen or subject of a foreign state" under 28 U.S.C. § 1332(a)(2).

Dual nationality is the consequence of the conflicting laws of different nations, *Kawakita v. United States*, 343 U.S. 717, 734, 72 S.Ct. 950, 961, 96 L.Ed. 1249 (1952), and may arise in a variety of different ways.[10] The ambivalent policy of this country toward dual nationality is stated in a letter made a part of the record in this case from the Office of Citizenship, Nationality and Legal Assistance of the Department of State:

The United States does not recognize officially, or approve of dual nationality. However, it does accept the fact that some United States citizens may possess another nationality as the result of separate conflicting laws of other countries. Each sovereign state has the right inherent in its sovereignty to determine who shall be its citizens and what laws will govern them.

The official policy of this government has been to discourage the incidence of dual nationality. *See Savorgnan v. United States*, 338 U.S. 491, 500, 70 S.Ct. 292, 297, 94 L.Ed. 287 (1950); Warsoff, *Citizenship in the State of Israel*, 33 N.Y.U.L.Rev. 857 (1958) (detailing efforts of the U.S. government to prevent dual American-Israeli citizenship). *See also Hirabayashi v. United States*, 320 U.S. 81, 97–99, 63 S.Ct. 1375, 1384–1385, 87 L.Ed. 1774 (1943). Pursuant to that policy, since 1795 all persons naturalized are required to swear allegiance to the United States and "to renounce and abjure absolutely and entirely all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty of whom or which the petitioner was before a subject or citizen." 8 U.S.C. § 1448(a)(2). *See Savorgnan*, 338 U.S. at 500, 70 S.Ct. at 297. "The effectiveness of this provision is limited, however, for many nations will not accept such a disclaimer as ending their claims over naturalized Americans." Note, *Expatriating the Dual National*, 68 Yale

---

**9.** Our analysis applies only to American citizens who also possess another nationality. The considerations involved might be quite different were the person a national of two foreign nations but not of the United States.

**10.** Citizens of the United States who possess dual nationality may be divided into several groups. In the one category are included persons born in the United States of alien parents, but whose allegiance is claimed by the state of the parents' nationality. In a second class are found persons born abroad whose parents are citizens of the United States, but on whom citizenship is also conferred by the land of their birth. A third group comprises persons who become citizens of the United States either by their own or their parents' naturalizations, but whose country of origin does not recognize expatriation. A fourth type of dual citizenship arises in the case of minors who are citizens of the United States, but whose parents become naturalized in a foreign state and who thereby acquire the new nationality of their parents. This enumeration is not to be deemed exclusive, but comprehends the principal situations giving rise to dual nationality. *Tomasicchio v. Acheson*, 98 F.Supp. 166, 169 (D.D.C.1951).

L.J. 1167, 1169 n.11 (1959). *See, e. g., Coumas v. Superior Court,* 31 Cal.2d 682, 192 P.2d 449 (1948). Thus, dual nationality has been recognized in fact, albeit reluctantly, by the courts. *See Kawakita,* 343 U.S. at 723–24, 72 S.Ct. at 955–56:

> [D]ual nationality [is] a status long recognized in the law. *Perkins v. Elg,* 307 U.S. 325, 344–349, 59 S.Ct. 884, 894–896, 83 L.Ed. 1320. The concept of dual citizenship recognizes that a person may have and exercise rights of nationality. in two countries and be subject to the responsibilities of both. The mere fact that he asserts the rights of one citizenship does not without more mean that he renounces the other.

Whether a person possessing dual nationality should be considered a citizen or subject of a foreign state within the meaning of 28 U.S.C. § 1332(a)(2) is a question of first impression in the courts of appeals. The two district courts other than the district court below which have addressed the question have reached seemingly different conclusions. In *Aguirre v. Nagel,* 270 F.Supp. 535 (E.D.Mich.1967), the plaintiff, a citizen of the United States and the State of Michigan, sued a Michigan citizen for injuries sustained when she was hit by the defendant's car. The court correctly ruled that the action was not one between citizens of different states under 28 U.S.C. § 1332(a)(1). Nevertheless, the court did find jurisdiction under 28 U.S.C. § 1332(a)(2) because the plaintiff's parents were citizens of Mexico and Mexico regarded her as a Mexican citizen by virtue of her parentage. The *Aguirre* court's opinion did no more than determine that the cause fell within the literal language of the statute without regard to the policies underlying alienage jurisdiction. As a result it has been questioned by the commentators, *see* 1 Moore's Federal Practice ¶ 0.75[1.–1] at 709.4–.5 (2d ed. 1979); 13 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3621 at 759–60 (1975), and rejected by one other district court in addition to the court below. *See Raphael v. Hertzberg,* 470 F.Supp. 984 (C.D.Cal.1979).[11]

*Raphael* was decided after the district court's judgment being reviewed here, and, although it does not cite the Eastern District of Wisconsin's opinion, it reaches the same conclusion. In *Raphael,* the plaintiff was a British subject who recently had been naturalized in the United States. The plaintiff and the defendant were domiciled in California. The court rejected the plaintiff's position that his purported dual nationality permitted him access to the federal courts under alienage jurisdiction. In rejecting the authority of *Aguirre,* the court noted several possible objections to permitting naturalized Americans to assert their foreign citizenship:

> To begin with, the holding in *Aguirre* violates the requirement of complete diversity (*Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806)) since *Aguirre,* like the present case, involved opposing parties who were both American citizens and who resided in the same state. Moreover, where both parties are residents of the state in which the action is brought, there is no reason to expect bias from the state courts. Finally, so long as the party asserting diversity jurisdiction is an American citizen, there is little reason to fear that a foreign government may be affronted by a decision adverse to that citizen, even if the American citizen also purports to be a citizen of that foreign nation. *See Blair Holdings Corporation v. Rubenstein,* 133 F.Supp. 496, 500 (S.D.N.Y.1955).

> The rule proposed by the plaintiff would give naturalized citizens nearly un-

---

11. The court in *Robinson v. Anastasiou,* 339 F.Supp. 472 (S.D.Tex.1972), relied on *Aguirre* in finding jurisdiction under 28 U.S.C. § 1332(a)(2). *Robinson,* however, is inapposite because the defendant there, although a domiciliary of the State of Texas being sued by a Texas citizen, was an alien never naturalized in the United States. Consequently, he was not a citizen of Texas under 28 U.S.C. § 1332(a)(1). *Robinson,* therefore, is no more than an application of the rule that an alien may sue or be sued by a citizen of one of the United States in federal court, regardless of the alien's domicile. *See* C. Wright, Law of Federal Courts § 24 at 93 n.7 (3d ed. 1976).

limited access to the federal courts, access which has been denied to native-born citizens. Such favored treatment is unsupported by the policies underlying 28 U.S.C. § 1332(a)(2). Finally, a new rule that would extend the scope of § 1332 is particularly undesirable in light of the ever-rising level of criticism of the very concept of diversity jurisdiction.

470 F.Supp. at 986.

Although the issue facing the courts in *Aguirre* and *Raphael* is the same as the one presented here, the facts in this case are somewhat different. All commentators addressing the issue have noted the anomaly of permitting an American citizen claiming dual citizenship to obtain access to the federal court under 28 U.S.C. § 1332(a)(2) when suing a citizen domiciled in the same state. *See* 1 Moore's Federal Practice ¶ 0.75[1–1] at 709.5 (2d ed. 1979):

This result is inconsistent with the complete diversity rule of *Strawbridge v. Curtiss*, . . . including the analogous situation of a suit between a citizen of State A and a corporation chartered in State B with its principal place of business in State A. Both state citizenships of the corporation must be considered and diversity is thus found lacking.

*See also* 13 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3621 at 759–60 (1975).[12] In the present case, however, the plaintiff was domiciled abroad when he initiated this action and therefore was not a citizen of any state. Thus, permitting suit under alienage jurisdiction would not run counter to the complete diversity considerations which arguably should have controlled the decisions in *Aguirre* and *Raphael*.[13]

The plaintiff seizing upon this factual difference would apparently have this court recognize his dual nationality for purposes of 28 U.S.C. § 1332 in much the same way corporations are regarded as having dual citizenship pursuant to 28 U.S.C. § 1332(c). Because in this case, even applying the corporate citizenship analogy, the complete diversity requirement is satisfied, the plaintiff argues that jurisdiction under 28 U.S.C. § 1332(a)(2) attaches. Such an approach, however, may be both too broad and too narrow and it ignores the paramount purpose of the alienage jurisdiction provision to avoid offense to foreign nations because of the possible appearance of injustice to their citizens. Imagine, for example, a native-born American, born of Japanese parents, domiciled in the State of California, and now engaged in international trade. A dispute could arise in which an Australian customer seeks to sue the American for, say, breach of contract in a federal court in California. The native-born American possibly could claim Japanese citizenship by virtue of his parentage, *see, e. g., Kawakita, supra, Hirabayashi, supra,* as well as his status as a citizen of California and defeat the jurisdiction of the federal courts because of the absence of complete diversity. Arguably, cases such as this are precisely those in which a federal forum should be afforded the foreign litigant in the interest of preventing international friction.

This hypothetical suggests that the analogy to the dual citizenship of corporations should not be controlling. Instead, the paramount consideration should be whether the purpose of alienage jurisdiction to avoid international discord would be served by

---

12. The requirement of complete diversity has been held to preclude jurisdiction over actions which otherwise could have been maintained under 28 U.S.C. § 1332(a)(2). *See Ed & Fred, Inc. v. Puritan Marine Insurance Underwriters Corp.,* 506 F.2d 757 (5th Cir. 1975).

13. Moreover, because in this case unlike *Aguirre* and *Raphael* the plaintiff is domiciled abroad, there might be some reason to fear bias if the suit were brought in the state courts. The fear of bias against out-of-state litigants, while a traditional basis for positing jurisdic-

tion, has of recent years been subject to questioning as being too remote and speculative a basis. And, because the plaintiff is an American citizen as well as an Egyptian, the risk of bias in a state forum against the litigant because he is also a foreign national would appear less substantial. The plaintiff's position, therefore, is little different than that of any other American national domiciled abroad. Such people, of course, cannot obtain access to the federal courts under the diversity or alienage jurisdiction provisions.

recognizing the foreign citizenship of the dual national. Because of the wide variety of situations in which dual nationality can arise, *see* note 10 *supra*, perhaps no single rule can be controlling. Principles establishing the responsibility of nations under international law with respect to actions affecting dual nationals, however, suggest by analogy that ordinarily, as the district court held, only the American nationality of the dual citizen should be recognized under 28 U.S.C. § 1332(a).

■ Under international law, a country is responsible for official conduct harming aliens, for example, the expropriation of property without compensation. *See* Restatement (Second) of the Foreign Relations Law of the United States §§ 164–214 (1965). It is often said, however, that a state is not responsible for conduct which would otherwise be regarded as wrongful if the injured person, although a citizen of a foreign state, is also a national of the state taking the questioned action. *See id.* at § 171, comments *b* & *c*. This rule recognizes that in the usual case a foreign country cannot complain about the treatment received by one of its citizens by a country which also regards that person as a national. This principle suggests that the risk of "entanglements with other sovereigns that might ensue from failure to treat the legal controversies of aliens on a national level," *Blair Holdings Corp. v. Rubinstein*, 133 F.Supp. at 500, is slight when an American citizen is also a citizen of another country and therefore he ordinarily should only be regarded as an American citizen for purposes of 28 U.S.C. § 1332(a). *See* 13 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3621 at 760 (1975) (risk of foreign country complaining about treatment of dual national is probably minimal); Currie, *The Federal Courts and the American Law Institute*, 36 U.Chi.L.Rev. 1, 10 n.50 (1968) ("[D]ual American and foreign citizenship could most simply be dealt with by treating the litigant as an Ameri-

can: . . . fear of foreign embarrassment seems excessive.").

■ Despite the general rule of nonresponsibility under international law for conduct affecting dual nationals, there are recognized exceptions. One is the concept of effective or dominant nationality. As qualified by the Restatement, this exception provides that a country (respondent state) will be responsible for wrongful conduct against one of its citizens whose dominant nationality is that of a foreign state, that is,

(i) his dominant nationality, by reason of residence or other association subject to his control (or the control of a member of his family whose nationality determines his nationality) is that of the other state and (ii) he (or such member of his family) has manifested an intention to be a national of the other state and has taken all reasonably practicable steps to avoid or terminate his status as a national of the respondent state.

Restatement (Second) of the Foreign Relations Law of the United States § 171(c) (1965). Although, in the ordinary case a foreign country cannot complain about the treatment received by a citizen who is also a national of the respondent state, in certain cases the respondent state's relationship to the person is so remote that the individual is entitled to protection from its actions under international law. Assuming *arguendo* that a dual national whose dominant nationality is that of a foreign country should be regarded as a "citizen or subject of a foreign state" within the meaning of 28 U.S.C. § 1332(a)(2), the record establishes that the plaintiff's Egyptian nationality is not dominant.

■ Although at the time of the filing of his complaint in 1976 the plaintiff resided in Egypt, his voluntary naturalization in the United States in 1973 indicates that his dominant nationality is not Egyptian.[14] As part of the naturalization process he swore

---

**14.** In the *Nottebohm Case*, [1955] I.C.J.Rep. 4, 22, the International Court of Justice recognized the dominant nationality concept and noted that although residence is an important factor in determining which country has stronger ties to the individual, it is not controlling. *See* Griffin, *The Right to a Single Nationality*, 40 Temp.L.Q. 57, 63 (1966).

allegiance to the United States and renounced any to foreign states. His actions subsequent to his naturalization evince his resolve to remain a U.S. citizen despite his extended stay abroad. Thus, it cannot be said that he "has taken all reasonably practicable steps to avoid or terminate his status as a national." Restatement (Second) of the Foreign Relations Law of the United States § 171(c)(ii) (1965). The plaintiff registered with the U.S. Embassy during his stays in Lebanon and Egypt. He states that he voted by absentee ballot in the 1976 presidential election. He has insisted that throughout his foreign travels he retained his U.S. citizenship [15] and in fact did not seek employment opportunities that may have been available in Egypt because they might have jeopardized his status as a U.S. citizen. See 8 U.S.C. § 1481(a)(4).[16] His actions, therefore, manifest his continued, voluntary association with the United States and his intent to remain an American. Certainly neither he nor the government of Egypt can complain if he is not afforded a federal forum when the same would be denied a similarly situated native-born American.

### V. Can the Defendants Be Estopped from Raising the Subject Matter Jurisdiction of the District Court?

The plaintiff's final argument is that the defendants should be estopped from questioning the subject matter jurisdiction of the court because they waited more than two years after the initiation of the action to raise the jurisdictional issue and the statute of limitations in the meantime had run on the plaintiff's claim. The plaintiff relies on *Di Frischia v. New York Central R.R.,* 279 F.2d 141 (3d Cir. 1960), in support of his estoppel theory.

The plaintiff's position seemingly runs counter to the first principle of federal jurisdiction. "The first duty of counsel is to make clear to the court the basis of its jurisdiction as a federal court. The first duty of the court is to make sure that it exists." Hart & Wechsler's The Federal Courts and the Federal System 835 (2d ed. 1973). Consequently, it has been the virtually universally accepted practice of the federal courts to permit any party to challenge or, indeed, to raise sua sponte the subject matter jurisdiction of the court at any time and at any stage of the proceedings. See, e. g., *American Fire & Casualty Co. v. Finn,* 341 U.S. 6, 16–19, 71 S.Ct. 534, 541–542, 95 L.Ed. 702 (1951); *Capron v. Van Noorden,* 6 U.S. (2 Cranch) 126, 2 L.Ed. 229 (1804); *Rice v. Rice Foundation, Inc.,* 610 F.2d 471 (7th Cir. 1979). The duty of the district court to undertake this jurisdictional inquiry has been codified in the Civil Rules which provide "*[w]henever* it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court *shall* dismiss the action." Fed.R.Civ.P. 12(h)(3) (emphasis added).

A corollary of the principle of the limited jurisdiction of the federal courts is that jurisdiction otherwise lacking cannot be conferred by consent, collusion, laches, waiver, or estoppel. See *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 377 n.21, 98 S.Ct. 2396, 2404 n.21, 57 L.Ed.2d 274 (1978); *Page v. Wright,* 116 F.2d 449 (7th Cir. 1940); *In re Federal Facilities Realty Trust,* 227 F.2d 651, 656 (7th Cir. 1955). It has been suggested that this limitation is not necessarily one of constitutional dimension, *see generally* Hart & Wechsler's The Federal Courts and the Federal System

---

**15.** Q. You, throughout this period, maintained your U.S. Citizenship?
A. Very much so. In fact, overseas, you feel more American than in the United States.

**16.** Q. When you say you could have had a job but you didn't want it because there wouldn't have been enough challenge to you, not enough work in the job?

A. I didn't mean I didn't want it, but I think in order to work for a foreign country I have to lose my citizenship, and I wouldn't want that to happen.
Q. So, you didn't want to work in Egypt then because you didn't want to lose your United States Citizenship?
A. Right. If you work for a foreign government, this is stated in your passbook, you are not allowed.

837–39 (2d ed. 1973), American Law Institute, Study of the Division of Jurisdiction Between State and Federal Courts 370–74 (1969), and it occasionally is both wasteful of judicial resources and harsh in its results. Nevertheless, it has been almost universally applied by the courts.

The most notable exception is the decision of the court of appeals in *Di Frischia*. There the defendant pleaded the lack of jurisdiction over the subject matter in its answer, but then later abandoned its objection and stipulated that jurisdiction existed. More than two years later, after the limitations period had run on the plaintiff's claim, the defendant attempted to renew its jurisdictional challenge. The Third Circuit refused to entertain the belated attempt, castigating the defendant for playing "fast and loose with the judicial machinery" and deceiving the courts. 279 F.2d at 144.

The *Di Frischia* decision has received considerable attention from the commentators, *see* authorities cited in 13 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3522 at 50 n.18 (1975), but has been ignored, criticized, or limited to its facts and distinguished by the federal courts. *See, e. g., Eisler v. Stritzler*, 535 F.2d 148, 151–52 (1st Cir. 1976); *Joyce v. United States*, 474 F.2d 215, 218 n.1 (3d Cir. 1973); *Basso v. Utah Power & Light Co.*, 495 F.2d 906 (10th Cir. 1974). *In re Consolidated Pretrial Proceedings in the Airlines Cases*, 582 F.2d 1142, 1152 & n.17 (7th Cir. 1978), is apparently the only decision of this court discussing *Di Frischia*. There we indicated that were we to follow *Di Frischia* at all it would be applicable only on "its unusual facts." Several facts distinguish this case from the one before the Third Circuit. First, the defendants in this action did not first raise, then drop, and then renew their jurisdictional objection. The filing of their motion to dismiss was the first time the issue had been raised. Second, in the *Di Frischia* case the defendants stipulated to underlying facts upon which the jurisdiction of the court depended. No such stipulation was made here. Finally, in this case the jurisdictional allegation in the plaintiff's complaint, even if deemed impliedly admitted by the defendants, is insufficient on its face to show the jurisdiction of the district court over the subject matter. If there ever is an appropriate set of circumstances in which the doctrine of estoppel should be invoked to prevent a direct attack on the federal court's jurisdiction, *but see Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 377 n.21, 98 S.Ct. 2396, 2405 n.21, 57 L.Ed.2d 274 (1978) ("the asserted inequity in the [defendant's] alleged concealment of its citizenship is irrelevant"), this case does not present it.

## VI. Conclusion

Our decision that this suit is not within the jurisdiction of the federal courts does not necessarily mean that it is outside the constitutional definition of the federal judicial power. *Compare Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806) *with State Farm Fire & Casualty Co. v. Tashire*, 386 U.S. 523, 530–31, 87 S.Ct. 1199, 1203, 18 L.Ed.2d 270 (1967) (complete diversity is a statutory, not a constitutional requirement). It merely means that the suit is unauthorized by 28 U.S.C. § 1332(a) as we have construed it. The statutory terms "citizens of different States" and "citizens or subjects of a foreign state" are presumably amenable to some congressional expansion consistent with the constitutional limitations on the judicial power if Congress sees the need for such expansion. *See National Mutual Insurance Co. v. Tidewater Transfer Co.*, 337 U.S. 582, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949). The judgment of the district court is Affirmed.