# Eligibility of a Noncitizen Dual National for a Paid Position Within the Department of Justice

The Department of Justice must determine the "dominant, effective" nationality of a noncitizen with dual nationality to determine that person's eligibility for a paid position in the Department under section 606 of the Treasury, Postal Service, and General Government Appropriations Act, 1997.

October 11, 1996

MEMORANDUM OPINION FOR THE ASSISTANT DIRECTOR
OFFICE OF ATTORNEY PERSONNEL MANAGEMENT

You have sought our views on the question whether, in light of section 606 of the Treasury, Postal Service, and General Government Appropriations Act, 1997, Pub. L. No. 104–208, 110 Stat. 3009–314, –354 (1996) ("section 606"), the Department of Justice may offer a paid position to a noncitizen who is a national of two foreign States. [1] Section 606 prohibits, with various exceptions, the use of appropriated funds to employ noncitizens whose post of duty is in the continental United States; the prohibition is, however, inapplicable to "nationals of those countries allied with the United States in the current defense effort." In the case you have described, a noncitizen law student, who is a dual national of Canada and Bangladesh, is an applicant for the Department's Summer Law Intern Program. That program involves employment at the GS–7 level solely within the continental United States.

The State Department maintains a list of countries "allied with the United States in the current defense effort." [2] You have advised us that Canada is included on this list, but that Bangladesh is not.

Although Congress has repeatedly enacted appropriations laws that restrict the employment of noncitizens, it has also significantly modified those restrictions through a series of exceptions. See Hampton v. Mow Sun Wong, 426 U.S. 88, 108–09 (1976). Specifically, in 1943, it created an exception for " 'nationals of those countries allied with the United States in the prosecution of the war' " Id. at 109 (quoting Act of June 26, 1943, ch. 146, 57 Stat. 196, 196). That exception,

---

[1] See Memorandum for Richard L. Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel, from Marc R. Salans, Assistant Director, Office of Attorney Personnel Management, Re: Eligibility of Dual Citizen for Paid Position (Oct. 7, 1996).

[2] We have reviewed the basis of the State Department's determinations in Memorandum to Files, from Todd D. Peterson, Attorney Advisor, Office of Legal Counsel, Re: Request for Advice from Administrative Office of United States Courts Concerning the Interpretation of 31 U.S.C. § 699(b) (Dec. 20, 1982) (the "Peterson Memo").

We note that the Comptroller General's Office has stated that the decision concerning what countries should be considered "allied" is a political one, which it will not challenge in an audit. In particular, it has stated that "a determination that Canada is allied with the United States in the current defense effort is a political judgment not subject to the decision of this Office. However, we believe it to be a commonly accepted fact that Canada is so allied, and we would not question an affirmative administrative determination to that effect." Matter of: Clarence D. Swanson, Unpublished Opinion B–188852, 1977 WL 12358 at *3 (C.G.).

the substance of which has often been re-enacted, is the basis of the present section 606. *See* Peterson Memo at 1.

### Analysis

The plain language of section 606 does not decide the question presented. It is true that the applicant is a national of an "allied" country, and so would seem eligible for hire. But it is also true that the applicant is a national of a *nonallied* State, and thus would remain subject to the general ban on noncitizens. Moreover, Congress has crafted careful, narrowly drawn exceptions in section 606 for the nationals of particular nonallied countries (e.g., for aliens from Cuba, provided they are lawfully admitted permanent residents, or for nationals of the People's Republic of China, if they qualify for adjustment of status under the Chinese Student Protection Act). It would seem, therefore, that nationals of *other* nonallied countries should remain ineligible, notwithstanding that they may also happen to have the nationality of an "allied" State. Thus, the language of the statute does not resolve the issue.

Similarly, examination of the policies behind section 606 does not yield a straightforward answer. The general exclusion of noncitizens from federal employment in the United States seems to be aimed chiefly at protecting national security by ensuring the loyalty of federal employees, encouraging noncitizens who seek federal employment to become naturalized, and shielding United States nationals from competition in a substantial sector of the labor market. *See Hampton v. Mow Sun Wong*, 426 U.S. at 94, 104 (reviewing arguments of executive branch). The exception for nationals of "allied" foreign States, on the other hand, serves distinct, indeed often contrary, interests: it allows federal employers greater flexibility in meeting their personnel needs; it expresses this Nation's solidarity with its allies; and it signifies confidence that the nationals of such allies are unlikely to betray the trust that the United States Government has reposed in them. Any simple, "bright line" rule that treated dual nationals in the applicant's position as eligible — or as ineligible — would promote some of these policies only at the expense of others.

We think that the statute is best read, and the policies behind it most satisfyingly accommodated, by applying the concept of "effective, dominant nationality." That concept, which derives from international law,[3] has also been invoked by

---

[3] *See Nottebohm (Liechtenstein v. Guatemala)*, 1955 I.C.J. 4, 22 (Apr. 6) ("International arbitrators . . . have given their preference to the real and effective nationality, that which accorded with the facts, that based on stronger factual ties between the person concerned and one of the States whose nationality is involved . . . . Similarly, the courts of third States, when they have before them an individual whom two other States hold to be their national, seek to resolve the conflict by having recourse to international criteria and their prevailing tendency is to prefer the real and effective nationality."); *see also* 8 Marjorie M. Whiteman, *Digest of International Law* 1252–55 (1967) (quoting decision of Italian-United States Conciliation Commission in *Mergé Claim, see United States ex rel. Mergé v. Italy*, 22 I.L.R. 443 (Italian-U.S. Conciliation Comm'n, 1955) discussing international law origins and applications of concept of effective, dominant nationality).

Continued

the federal courts to resolve disputes under domestic law that involve dual nationals. For example, the court in *Sadat v. Mertes*, 615 F.2d 1176 (7th Cir. 1980), made use of the concept in analyzing whether the "alienage jurisdiction" statute, 28 U.S.C. § 1332(a)(2), which vests the district courts with jurisdiction over civil actions between citizens of States of the United States and citizens of foreign States, gave rise to jurisdiction in a case involving a naturalized citizen who was also an Egyptian national under that country's laws.[4] The court explained the concept as follows:

> Under international law, a country is responsible for official conduct harming aliens, for example, the expropriation of property without compensation. It is often said, however, that a state is not responsible for conduct which would otherwise be regarded as wrongful if the injured person, although a citizen of a foreign state, is also a national of the state taking the questioned action . . . .
>
> Despite the general rule of nonresponsibility under international law for conduct affecting dual nationals, there are recognized exceptions. One is the concept of effective or dominant nationality . . . . [T]his exception provides that a country (respondent state) will be responsible for wrongful conduct against one of its citizens whose dominant nationality is that of a foreign state, that is,
>
>> (i) his dominant nationality, by reason of residence or other association subject to his control . . . is that of the other state and (ii) he . . . has manifested an intention to be a national of the other state and has taken all reasonably practicable steps to avoid or terminate his status as a national of the respondent state.
>
> *Restatement (Second) of the Foreign Relations Law of the United States* § 171(c) (1965).

615 F.2d at 1187 (citation omitted).

Applying the *Restatement*'s tests, the *Sadat* court found that the plaintiff was not a "citizen[ ] or subject[ ] of a foreign state" under 28 U.S.C. § 1332(a)(2),

---

The doctrine of dominant and effective nationality rests on two fundamental principles that reflect a contemporary view of the link of nationality. First, the concept of nationality embodies more than a tenuous legal bond asserted by municipal law . . . . Second, nationality is a product of personal choice and action. The conduct of the individual furnishes the only sound juridical foundation for recognition of a single nationality.

Note, *Claims of Dual Nationals in the Modern Era: The Iran-United States Claims Tribunal*, 83 Mich. L. Rev. 597, 613 (1984) (footnote omitted).

[4] Later decisions have followed *Sadat. See, e.g., Soghanalian v. Soghanalian*, 693 F. Supp. 1091 (S.D. Fla. 1988).

i.e., that his dominant, effective nationality was American, not Egyptian. Although the plaintiff had resided in Egypt rather than in the United States, his actions "manifest[ed] his continued, voluntary association with the United States and his intent to remain an American." 615 F.2d at 1188. [5] For example, he had registered with the U.S. Embassy during his sojourns abroad, had cast an absentee ballot in a Presidential election, and had not sought employment that might jeopardize his status as a naturalized U.S. citizen. *Id.*

These tests should be used to determine the dominant, effective nationality of the applicant in question. [6] The primary question to be asked is what nationality is indicated by the applicant's residence or other voluntary associations. A second question is whether the applicant has manifested an intention to be a national of one of the two States, while also seeking to avoid or terminate nationality in the other. Of these two questions, the former will ordinarily be the more important. In *Sadat* itself, it was the plaintiff's voluntary associations with the United States that led the court to find that his dominant nationality was American: he had not sought to terminate or avoid his Egyptian nationality, and had in fact maintained significant contacts with that country. Consequently, we believe that a dual national can be found to have a dominant, effective nationality of one country, even if he or she takes no affirmative steps to terminate or avoid the nationality of the other — indeed, even if he or she makes a conscious decision to retain the latter nationality. [7]

We believe that the procedure we have outlined serves the various, and sometimes conflicting, goals of section 606. In particular, it will enable the United States to demonstrate its good will toward allied States and its confidence in their nationals, without compromising national security. Moreover, the results of following the procedure should be both fair to individual applicants and satisfactory to federal employers. Because "municipal law determines how citizenship may be acquired," *Perkins v. Elg*, 307 U.S. 325, 329 (1939), [8] an applicant may be deemed a national of a particular country under its domestic law, even if he or she has no significant voluntary ties whatever to that country. [9] It would be unfair

---

[5] As the International Court of Justice explained in *Nottebohm*, "the habitual residence of the individual concerned is an important factor [in determining dominant nationality], but there are other factors such as the centre of his interests, his family ties, his participation in public life, attachment shown by him for a given country and inculcated in his children, etc." 1955 I.C.J. at 22.

[6] Although making these determinations may entail some administrative inconvenience, we think that the difficulties should not be substantial.

[7] We note also that it may be a legal *impossibility*, under applicable municipal law, for an individual to renounce a particular nationality. Knowing that the effort to renounce that nationality would be futile, the individual may make no attempt to do so. In such a case, the decision not to make such an attempt should obviously not prevent a court or agency from finding the individual's *other* nationality to be dominant.

[8] *See also Murarka v. Bachrack Bros., Inc.*, 215 F.2d 547, 553 (2d Cir. 1954) (Harlan, J.) ("It is the undoubted right of each country to determine who are its nationals, and it seems to be general international usage that such a determination will usually be accepted by other nations.").

[9] "Municipal laws broadly applying the doctrine of *jus sanguinis* can . . . create dual nationality without regard to the individual's connection to the state. Under this doctrine children are nationals if their parents are nationals,

Continued

369

to deny the possibility of federal employment to that applicant merely because of such an incidental, nonvoluntary status, if the country in question happened to be nonallied. Equally, it would be unreasonable to treat such an applicant as eligible for federal employment merely because the country happened to be allied, when the applicant's actions and choices demonstrated a conscious commitment to the nationality of another, nonallied State.

RICHARD L. SHIFFRIN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

irrespective of the links (birth or domicile) between the child and the state." Note, *supra* note 3, at 607 (footnote omitted).