OPINION OF THE COURT
Stanley Parness, J.
This is a motion by International Tin Council to stay arbitration at the American Arbitration Association in New' York City. Respondent, Amalgamet Inc., is a New York domiciled corporation engaged in the business of buying and selling metals. Petitioner, - International Tin Council (ITC), is an organization based in London, composed of traders in tin which include 22 member countries who produce or consume tin. Its purpose is to make a market in tin contracts and futures so as to stabilize the international trading of tin and to ensure the availability of adequate supplies in the world market.
During the period from 1982-1985 Amalgamet had entered into 38 buy and sell contracts with ITC. On October 25, 1985, the bottom had apparently dropped out of the tin market and the price of tin fell from $5.43/lb to $2.50/lb. The London Exchange immediately suspended trading in tin. As a result petitioner, ITC, refused to honor three contracts in which it *385 had agreed to purchase quantities of tin from respondent at precrisis prices.
Respondent’s claim is for the damages sustained by reason of ITC’s failure to complete these three tin purchases at the price agreed. In attempting to enforce its claim, respondent served a demand for arbitration relying upon an arbitration clause contained in a confirmation of sale form employed by Amalgamet in its transactions with ITC.
In the within proceeding, petitioner, ITC, seeks to stay arbitration on two grounds. First, that petitioner is immune from suit and legal process based on a sovereign status it claims to enjoy under the laws of the United Kingdom and also under the law of international comity and, second, that petitioner had never consented to arbitration nor is it bound by any arbitration clause contained in the sales form.
As to this first ground, ITC predicates its immunity from process and suit upon the fact that it was established pursuant to an international compact made between 22 governments and other international entities which produce or consume tin (the United States is not a member). Pursuant to the terms of that compact, ITC was to be headquartered in the United Kingdom (U.K.). To this end ITC entered into a "Headquarters Agreement” with the U.K., which in turn was implemented by a U.K. parliamentary statute (the International Tin Council [Immunities and Privileges] Order 1972 [1972 Order]).
Under the Headquarters Agreement (art 8 [1]) and the 1972 Order, ITC was to be immune from suit and legal process except where ITC "shall have expressly waived such immunity in a particular case” or under other certain exceptions (see, 1972 Order § 6; Headquarters Agreement arts 23, 24).
Petitioner ITC urges that since Amalgamet does not come within these exceptions, the court should afford ITC the same immunity from suit and legal process here as would obtain had Amalgamet sought to enforce its claim in London.
Sovereign immunity is recognized by our courts as being derived from the following sources:
1. The Foreign Sovereign Immunities Act of 1976 (FSIA) (28 USC § 1602 et seq).
The FSIA grants to foreign States immunity from suit in the United States. Clearly ITC is not a foreign State and derives no benefit from this statute.
*386 2. The International Organizations Immunities Act (IOIA) (22 USC §§ 288 — 288f-2).
This statute provides certain international organizations with the same immunities granted to foreign States under the FSIA. However, the term "international organization” is defined in the IOIA as: "a public international organization in which the United States participates * * * and which shall have been designated by the President through appropriate Executive order as being entitled to enjoy the privileges, exemptions, and immunities herein provided”. (22 USC § 288.) As conceded by petitioner in its brief, ITC does not meet these requirements for IOIA immunity nor has the President, by executive order, provided for same.
3. The Act of State Doctrine.
Under this doctrine it is recognized that even where sovereign immunity does not technically exist, certain international disputes more properly should be resolved by the executive branch of the United States Government rather than by the courts. Generally, this doctrine is involved where the dispute is intrinsically involved with some sovereign function of a foreign entity so that political as well as purely private commercial issues are implicated. ITC urges the applicability of this doctrine to it, citing MOL, Inc. v Peoples Republic of Bangladesh (572 F Supp 79, affd 736 F2d 1326, cert denied 469 US 1037 [1984]) where the court declined to interfere wdth Bangladesh’s exercise of its sovereign function of regulating wildlife. Similarly cited by petitioner is International Assn. of Machinists & Aerospace Workers v Organization of Petroleum Exporting Countries (477 F Supp 553). In that case, plaintiffs sought to assert an antitrust claim against OPEC on the ground of price-fixing. The court declined jurisdiction on the ground of sovereign immunity.
The doctrine, however, was held not to be applicable where the dispute arises out of a purely commercial transaction. Thus, in Texas Trading & Milling Corp. v Federal Republic of Nigeria (647 F2d 300, cert denied 454 US 1148), the court permitted a suit against Nigeria for breach of a contract for the purchase of cement.
Unlike the issues of oil price-fixing or wildlife protection with which the cases cited by ITC were concerned, no political or sovereignty issues are involved herein. What is presented are simply contracts for the purchase of tin which ITC has purportedly breached. ITC’s decision to enter into this con *387 tract or its breach raises issues solely of private law between two contracting entities. ITC has failed to demonstrate the presence of broader political or sovereign consequence were it compelled to defend and respond in damages. Further, under the Headquarters Agreement and 1972 Order, had Amalgamet been a U.K. corporation or had its principal place of business in the U.K. and had an arbitration clause been contained in the sales contract, it would have been enforceable in the U.K. and possibly also in the United States, if the arbitration clause so provided.
Specifically, article 23 of the Headquarters Agreement between the U.K. and ITC provides that: "where the council enters into contracts * * * with person resident in the United Kingdom or a body incorporated or having its principal place of business in the United Kingdom and embodies the terms of the contract in a formal instrument, that instrument shall include an arbitration clause whereby any disputes * * * be submitted to private arbitration.”
ITC does not explain why significant political or sovereign rights become implicated if Amalgamet is permitted to enforce arbitration in the United States but not if Amalgamet were a U.K. corporation asserting such claim in a London arbitration. ITC thus fails to demonstrate the applicability of the Act of State Doctrine to the transactions involved in the instant litigation.
As an alternate to its claim for immunity based upon sovereign or sovereign-like privileges, ITC urges recognition of its immunity from process or suit in the United States, under general principles of international comity.
As petitioner notes, comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience”. (Hilton v Guyot, 159 US 113, 164 [1895]; Matter of Sumitomo Corp. v Parakopi Compania Maritima, 477 F Supp 737, 741-742, affd 620 F2d 286.) Thus, ITC asserts, the immunities granted to ITC under the laws of the U.K. (1972 Order) should be honored by the courts in the United States particularly where a long history exists of reciprocal recognition between the United States and U.K. of each other’s laws and judgments.
Principles of comity generally apply to the enforcement in the United States of foreign judgments (Tahan v Hodgson, 662 F2d 862), and to foreign court proceedings. (Laker Airways v *388 Sabena, Belgian World Airlines, 731 F2d 909.) However, a court may, in a particular case, also give recognition to the laws of a foreign State. Since the instant case does not involve the enforcement of a U.K. judgment or the validity of an act of a U.K. court, the issue, thus narrowed, is whether this court should recognize under principles of international comity a law of the U.K. which grants immunity to a U.K. resident from a suit in contract but to none other?
Since immunity from suit is in derogation of the normal exercise of jurisdiction by the courts, it should be accorded only in clear cases (Victor Transp. v Comisaria Gen. de Abastecimientos y Transportes, 336 F2d 354, cert denied 381 US 934).
On examination, the Headquarters Agreement entered into between ITC and the U.K. does not appear to concern itself with immunity in any place other than the U.K. Indeed, article 8 (1) of this agreement which grants immunity only mentions its applicability "in the territory of the host government.” Similarly article 14 only refers to "status, privileges and immunities at the council while in the territory of the host member.”
That the grant of immunity was not intended to have extraterritorial effect but only to be valid in the host country is evidenced further from the fact that the Headquarters Agreement specifically provides that in "the event of the Headquarters of the Council being moved from the territory of the United Kingdom this agreement shall cease to be in force.” Thus, the very wording and language of the Headquarters Agreement with U.K. demonstrates its concern only with immunity within the U.K.
Parenthetically, the United States has entered into a similar "Headquarters Agreement” with the United Nations (see, 22 USC § 287 et seq.) pursuant to which immunity from legal process is provided to United Nations diplomats while in the United States. One would not expect a foreign State, particularly one not a member of the United Nations (as the United States is not a member of the ITC), to recognize such immunity in a contract action brought against such diplomat at home or in another foreign State where he does not have diplomatic status. But that is the result which would attend under petitioner’s view of its agreement with the U.K.
Further, as noted, U.K. would have permitted enforcement of the same arbitration claim in the U.K. if brought by a *389 British corporation or resident (under arts 23-24 of the Headquarters Agreement as implemented by the 1972 Order). It is somewhat presumptuous to suggest, as ITC does, that a United States court as a matter of comity deprive a United States corporation of the right to enforce a claim against ITC in the United States, where the U.K. would permit same to be brought by its own citizens against ITC in the U.K.
In a case cited by respondent, the High Court of Malaya (Bank Bumysuta Malysia BHD v International Tin Council, Jan. 13, 1987) ruled on this very issue of claimed extraterritorial immunity. The plaintiff, there, sought to recover on a loan and to enforce certain security interests against ITC based upon loans made by a London branch of the bank. The loans were executed in London. As in the instant case, ITC asserted the statutory immunity granted under the 1972 Order to bar the action in Malaya. The court held that although Malaya is a member of ITC (which the United States is not) immunity from suit outside of the U.K. "does not appear to have been sought or given” by the parties to the international agreement. The court then cited a decision of the English Royal Court enunciating the modern rule, to wit: "a foreign sovereign has no immunity when it enters a commercial transaction with a trader here and a dispute which is properly within the International jurisdiction of our courts * * * international comity requires that it (i.e. the foreign sovereign) should abide by the rules of the market.” (Threntex Corp. v Central Bank, 2 WLR 356, 368.)
However, even were the U.K. immunity to be given effect by this court, the same could be waived. The 1972 Order (§6) expressly provides that immunity can be lost if "the council shall have expressly waived such immunity in a particular case.” It is Amalgamet’s position that the arbitration clause contained in the confirmation of sale countersigned by ITC constitutes such a waiver. In Arab Banking v International Tin Council (Jan. 15, 1986), the English Royal Court of Justice found the following language in a contract to be an express waiver of immunity: "This credit facility shall be governed by and construed in accordance with the law of England and shall be subject to non-exclusive jurisdiction of the English Courts.” The language is nearly identical with that found in the arbitration clause in the instant case which states that: "This contract shall be governed by and construed in accordance with the laws of the State of New York. Any controversy shall be settled by arbitration in the City of New York *390 in accordance with the rules of the American Arbitration Association.” If the language of the cited contract clause in the Arab Banking case (supra) as held by an English court is a waiver of immunity from suit, then the language of the arbitration clause in the instant case would have the same effect.
In sum, this court concludes firstly, that whatever the consequences of ITC’s Headquarters Agreement with U.K., and the latter’s implementation statute (1972 Order), they were never intended to have, nor should they be given, extraterritorial effect so as to bar Amalgamet from enforcing a breach of contract claim against ITC in this jurisdiction. Further, even if such extraterritorial application were to be found, the same would be deemed waived by the arbitration clause worded similarly to that set forth on the reverse side of each of the signed Amalgamet’s confirmation letters.
The second ground advanced by ITC in opposition to arbitration is that it never agreed to the inclusion of this arbitration clause as part of its transaction with Amalgamet and is therefore not bound by it. The issue resolves to whether ITC consented and/or agreed to the arbitration clause contained in the confirmation form sent to Amalgamet by ITC.
A party cannot be held to arbitration unless there is a clear indication that it has agreed or consented to that forum for the resolution of disputes. (Matter of Marlene Indus. Corp. [Carnac Textiles], 45 NY2d 327, 333-334; Gangel v DeGroot, 41 NY2d 840, 841.) To determine whether ITC agreed to be bound by the arbitration clause in the instant case it is instructive to consider the documents and procedures utilized by the parties while doing business with each other.
In the course of their three-year dealings, the standard procedure between Amalagamet and ITC had been for Amalgamet’s tin trader, Anthony Turner, to call up the ITC trader (called the buffer stock manager) and agree to terms for the purchase or sale of tin. Turner, on behalf of Amalgamet, would confirm such terms by telex and on the same day Amalgamet would send its signed confirmation of the transaction to ITC in multiple copies. ITC’s buffer stock manager would then countersign and return one copy of the confirmation to Amalgamet.
The face side of the confirmation is in letter form bearing Amalgamet’s letterhead and addressed to ITC. The terms of the purchase or sale are stated and there is a line on the right *391 side of the bottom of the page for the signature of the person signing for Amalgamet and on the left side a request to "kindly sign and return the duplicate of this contract” with a line for a signature.
The reverse side of the confirmation form contains differing matter depending on the nature of the transaction. Where the transaction is a sale by Amalgamet, the reverse side of the form contains five short printed paragraphs dealing with delivery, warranties, delay in shipment and default in payment and the last, an arbitration clause providing for disputes to be arbitrated in the City of New York under the rules of the American Arbitration Association. Where the transaction is a purchase by Amalgamet, the reverse side of the form contains only the arbitration clause.
The three tin transactions from which Amalgamet’s alleged damage arose were all tin sales to ITC which occurred on August 8, September 10 and October 8. Each sale took place in essentially the same way the parties had transacted business in the past and in each Amalgamet sent a signed confirmation form to ITC for its countersignature. ITC returned a signed copy for the August 8 and September 10 sales but not for the last (Oct. 8). By then, apparently, the panic in tin had developed. ITC does not contest the fact that its agent had countersigned each confirmation form sent to it by Amalgamet (except the last).
ITC’s specific objection to being bound by this arbitration clause is twofold. It contends that the inclusion of the arbitration clause in the confirmation form added new terms to the sale made orally over the phone so that at best it constituted a proposal for an additional term to the sale agreement which was not knowingly accepted by ITC. Secondly, ITC contends that the manner in which the clause is placed on the back of the confirmation letter unfairly imposed a condition upon ITC to which it never intended to agree.
On the first issue, ITC cites UCC 2-207 (2) and several cases (see, Supak & Sons Mfg. Co. v Pervel Indus., 593 F2d 135) to support its claim that the "insertion” of the arbitration clause in the confirmation order constituted a "material alteration” of the oral telephone agreement. Whatever effect the original placing of the order over the telephone had, the parties in over 35 prior transactions memorialized their agreements in writing in the jointly signed Amalgamet’s confirmation letters. There is, therefore, no question that whatever *392 preliminary procedure occurred between the parties, the executed written confirmation letter represents the contract governing each transaction. ITC’s agent acknowledged this by signing when asked to sign and to "kindly return a copy of this contract” (emphasis supplied).
Further, it has been held that the fact that the parties may not have specifically discussed an arbitration clause will not defeat its effect where the parties have actually signed a purchase order which contained such a clause (Matter of Mostek Corp. [North Am. Foreign Trading Corp.], 120 AD2d 383).
ITC contends, however that the manner in which Amalgamet placed its arbitration clause on the back of the form indicates a conscious attempt on the latter’s part to unfairly slip this provision into the contract without making ITC aware of its presence. The fact is, however, that the provisions were in plain view on the reverse side of the copies sent to ITC in some 35 prior buy or sell transactions.
Though ITC now claims it would have objected to such a clause, as previously discussed, arbitration was the method of dispute resolution which it itself adopted with respect to contracts with U.K. companies (see, Headquarters Agreement § 8 [1]). The arbitration clause is in clear, understandable English and of a size that can be read unaided by magnification. It is inconceivable that in those many transactions, involving millions of dollars, ITC’s agent never saw the arbitration clause. Interestingly, no one actually involved in the transactions on behalf of ITC specifically avers lack of knowledge of this provision.
Of course, ITC’s position might have merit had Amalgamet merely sent the confirmation letter and was now attempting to impose acceptance of the terms therein solely from the fact that ITC had not voiced objection to the offending arbitration clause. (See, Matter of Marlene Indus. Corp. [Carnac Textiles] supra.) But here, the letters with the arbitration clause were countersigned by ITC’s agent. There is no better way to manifest an intent to be bound by a writing than by signing it. Indeed, "[a]s a general rule the signer of a written agreement is conclusively bound by its terms unless there is a showing of fraud, duress or some other wrongful act on the part of any party to the contract” (Columbus Trust Co. v Campolo, 110 AD2d 616, 617, affd 66 NY2d 701). The parties here are sophisticated commercial traders to whom the import of signing of a contract should be quite clear.
*393 In sum, a party should not be able to defeat an agreement he executes and a copy of which he retains without objection by merely asserting that he did not read it (Gervasio v DiNapoli, 134 AD2d 235 [2d Dept]; 1 Williston, Contracts § 35, at 97 [3d ed]; see also, I.J.S. Fabrics v Dan Riv., Inc., 56 NY2d 755).
With respect to the last transaction of October 8, 1985, which confirmation was never returned by ITC’s agent, I find that the past dealings of the parties, as evinced by prior signed confirmation letters all containing an arbitration clause, clearly indicate a continuing intent that their contract disputes be resolved by arbitration and further that with this past contractual history, the retention by ITC of the last confirmation letter without any objection constitutes a tacit acceptance of the arbitration clause contained therein. (See, Atlanta Shipping Corp. v Cheswick-Flanders & Co., 463 F Supp 614, 617; Woodcrest Fabrics v B & R Textile Corp., 95 AD2d 656, 661, affd 61 NY2d 887; Matter of Microtran [Edelstein], 30 AD2d 938.) As stated in Woodcrest Fabrics (supra, at 661): "An agreement to arbitrate, supplementing the express terms of a contract for the sale of goods, may be implied in a proper case from a course of past conduct or the custom and practice in the industry. An arbitration provision in a memorandum thereafter received by a party to the transaction would not * * * constitute a material alteration of the terms of the contract. A party who receives such a memorandum without communicating its objection within reasonable period of time would be bound by the arbitration provision, that provision having been * * * 'incorporated in the oral agreement of the parties in consequence of either trade usage or a prior course of dealings’ ”.
In conclusion, petitioner has failed to demonstrate that a stay of arbitration is warranted and the petition is dismissed.