**MOL, INC., Plaintiff,**

v.

**The PEOPLES REPUBLIC OF BANGLADESH, Defendant.**

**Civ. No. 82–892–RE.**

United States District Court,
D. Oregon.

Aug. 18, 1983.

**80**

John R. Faust, Jr., Thomas M. Triplett, David W. Axelrod, Nancie Potter Arellano, Schwabe, Williamson, Wyatt, Moore & Roberts, Portland, Or., for plaintiff.

Donald J. Lukes, Brophy & Lukes, Portland, Or., Laurens H. Silver, Laurie J. Nicholson, Laurence W. Kessenick, San Francisco, Cal., for amicus attys. for Animal Rights.

REDDEN, District Judge:

In this action plaintiff MOL, Inc., an Oregon corporation, seeks damages against a foreign nation, the People's Republic of Bangladesh. Defendant Bangladesh has not responded to this action and plaintiff seeks a default judgment. I deny the motion for default judgment and dismiss the action because it is barred by the Act of State Doctrine, and I lack subject matter jurisdiction over this controversy.

FACTS

Plaintiff seeks to challenge the revocation of a license granted by Bangladesh allowing it to capture and export rhesus monkeys from that country to the United States. The rhesus monkey, *macaca mulatta,* is a primate which ranges across much of southern Asia. Their anatomical and behavioral similarities to humans makes rhesus monkeys valuable for research purposes.

Until relatively recently, India was the major exporter of rhesus monkeys. Following India's ban on their export, Bangladesh became the world's principal source of supply. Rhesus monkeys have no particular religious significance in Bangladesh, a predominantly Muslin country.

In September 1976, plaintiff entered into negotiations in Bangladesh with representatives of the government of that nation, seeking to acquire a license from the Bangladesh Ministry of Agriculture, Division of Forests, Fisheries, and Livestock for the capture and export of rhesus monkeys. Six months later, Bangladesh granted that License in a document which is attached to plaintiff's motion as Exhibit A. In essence, the government of Bangladesh granted a license to plaintiff for the export of rhesus monkeys, in specified quantities and at specified prices. The Licensing Agreement also required that plaintiff construct, dur-

ing 1978, a "breeding farm" for rhesus monkeys. The License also contains the following language regarding the use of the rhesus monkeys for humanitarian purposes, which is quoted here in full:

USE OF RHESUS MONKEYS

33. This franchise and license is granted to Licensee by Licensor *on the grounds and sole condition* that the primates exported by Licensee from Bangladesh shall be used *exclusively* for the purposes of medical and other scientific research by highly skilled and competent personnel *for the general benefit of all peoples of the world.* It is generally understood that major contributions of nonhuman primates in medical programs include the unique functions of the study of physiology and immunology, infectious disease, cancer, metabolic disorders, cardiovascular and pulmonary disease, alcoholism, drug abuse, behavior, testing of biologics, and the reproduction of vaccines.

34. Licensee shall keep complete and accurate records as to the disposition and use of *each* Rhesus monkey exported from Bangladesh under this Agreement. These records shall be available for inspection by Licensor at any time during normal working hours or at other times upon reasonable notice. Licensor shall have notice at all times of the location of the records. To facilitate record keeping, each Rhesus monkey shall be individually identified by marking or tagging. The records are subject to audit at the discretion of Licensor. Licensor may request and receive copies of these records at any time. Duplicate [sic] of these records shall be kept in Bangladesh.

Licensing Agreement at page 14 (Emphasis added).

The Licensing Agreement also provides for the arbitration of disputes and gives Bangladesh the right to cancel the license without notice upon plaintiff MOL's nonperformance of its terms:

42. Any dispute between the parties, arising out of or in connection with this Agreement which cannot be resolved by the parties shall be resolved by arbitration in accordance with the provisions of the Arbitration Act, 1940, as adopted in Bangladesh. There shall be two arbitrators, one to be selected by Licensor and the other by Licensee.

43. TERMINATION. This agreement may be terminated by Licensor without notice if Licensee has failed to fulfill its obligations under this Agreement.

Licensing Agreement at page 18.

The Agreement was fully performed by all parties throughout the remainder of 1977. In November 1977, the government of India banned the export of rhesus monkeys. Bangladesh thus became the only remaining source for large numbers of wild rhesus monkeys for export. World prices for monkeys soared and the prices Bangladesh received from plaintiff were lower than world prices. The government of Bangladesh continued to comply with the Agreement throughout the remainder of 1977.

In the spring of 1978, the shortage of rhesus monkeys for research purposes in the United States became more acute. In late May of 1978 Bangladesh issued a notice to plaintiff in which cancellation of the license agreement was threatened in retaliation for plaintiff's alleged failure to construct a breeding farm, and to export monkeys in agreed numbers. Plaintiff responded to the notice from the government of Bangladesh by offering to begin work immediately on the breeding farm and by stating that its behavior was consistent with the Agreement. In September 1978, plaintiff dispatched a number of rhesus monkeys to the Armed Forces Radiobiology Research Institute for radiobiologic research. On January 3, 1979, Bangladesh announced that it was terminating the License because plaintiff had not constructed a "breeding farm" during 1978 as provided by the Licensing Agreement, and because plaintiff had breached Section 33 of the License, relating to the use of the monkeys only for humanitarian purposes, claiming that "the Rhesus monkeys exported from Bangladesh were sold to the Armed Forces Radio Biology Research Institute for neutron bomb radia-

tion experiments." *See* Affidavit of O'Loughlin at 5.

Plaintiff sought arbitration as provided by Section 42 of the Licensing Agreement, but Bangladesh asserted that its termination of the License pursuant to Section 43 was proper and lawful, and refused to arbitrate.

Plaintiff sought a diplomatic or political solution to the problem. Plaintiff offered to renegotiate the licensing agreement, and to give assurances of observation of any provision or clause in the license banning the use of monkeys for armed forces radiation experiments. Plaintiff also sought the aid of United States diplomatic representatives. Bangladesh refused to reinstate the License.

In 1982, plaintiff instituted this action against Bangladesh seeking damages for Bangladesh's termination of the License. Bangladesh has not appeared to defend this action, and plaintiff moves for a default judgment. The Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.*, contains a provision forbidding United States courts from granting a default judgment against a foreign sovereign "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). The purpose of this provision is to prevent unwarranted intrusions upon the diplomatic efforts of the United States by private litigants. Plaintiff in this case has filed affidavits and documents in support of its motion. *Amicus curiae* filed briefs with the court opposing the motion, arguing that foreign sovereigns' regulation of their natural resources and animal populations cannot be challenged in this court. I turn to a brief discussion of the applicable law, the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.*

*The Applicable Law*

A. Foreign Sovereign Immunity

Prior to 1976, the federal courts had developed a doctrine of foreign sovereign immunity which, while nominally absolute, also depended upon the judgment of the executive branch of the United States, acting through the Department of State, to assert or not assert sovereign immunity for a foreign sovereign in a particular case. *See generally Verlinden B.V. v. Central Bank of Nigeria,* —— U.S. —— at ——, 103 S.Ct. 1962 at 1967–1968, 76 L.Ed.2d 81 (1983); Weber, *The Foreign Sovereign Immunities Act of 1976: Its Origin, Meaning, and Effect,* 3 Yale Stud. in World Public Order 1 (1976). The State Department would generally assert only a "restrictive" theory of sovereign immunity, which barred suit against the foreign sovereign for its "governmental" public actions, and did not extend to "commercial" transactions. This doctrine, as stated in the "Tate Letter," relied upon a survey of the development of sovereign immunity law in other nations, which appeared to disclose a trend towards a "restrictive" view of sovereign immunity, in which a foreign sovereign would have immunity for its sovereign or public acts (*jure imperii*), but not its "private" acts (*jure gestionis*). (The "Tate Letter" is reprinted as Appendix 2 to the opinion of the United States Supreme Court in *Alfred Dunhill of London v. Republic of Cuba,* 425 U.S. 682, 711–715, 96 S.Ct. 1854, 1869–1871, 48 L.Ed.2d 301 (1976)). This "restrictive" view was ultimately codified by Congress in the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.* (Hereafter "FSIA").

The FSIA provides, at 28 U.S.C. § 1604, that foreign sovereigns "shall be immune from the jurisdiction of the courts of the United States and of the States," unless one of the exceptions stated in 28 U.S.C. § 1605 applies. The relevant provision for this case is 28 U.S.C. § 1605(a), which provides:

> A foreign state shall *not* be immune from the jurisdiction of the United States or the States in any case—
>
> (1) in which the foreign state has *waived* its immunity either explicitly or by implication . . .
>
> (2) in which the action is based upon a *commercial* activity carried on *in the United States* by the foreign state; or upon an act *performed in the United*

*States* in connection with *a commercial activity of* the foreign state *elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;*

. . . .

28 U.S.C. § 1605(a) (Emphasis added).

The plaintiff in this case does not contend there has been any waiver by Bangladesh of its sovereign immunity, but rather proceeds under the third clause of 28 U.S.C. § 1605(a)(2), the language of which is in emphasis above. That clause, of course, depends for its meaning upon the definition of "commercial activity," which is defined in 28 U.S.C. § 1603(d) as follows:

A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d).

In this case, therefore, the issue is whether Bangladesh's regulation of the capture and export of game is a "commercial" or "governmental" activity.

### B.   The Act of State Doctrine

The Act of State Doctrine is a legal principle which, like sovereign immunity, represents an attempt to deal with the special jurisprudential problems affecting the relations between sovereign states. *See generally International Ass'n of Machinists v. OPEC,* 649 F.2d 1354, 1358–1361 (9th Cir. 1981), *cert. denied,* 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982). The two doctrines differ, however, in that the sovereign immunity question goes to the jurisdiction of the court, while the Act of State Doctrine is a "prudential doctrine," a domestic legal principle developed by the courts of the United States, allied to the "political question" doctrine. *Id.* at 1359. The Act of State Doctrine requires that courts "not adjudicate a politically sensitive dispute which would require the court to judge the legality of the sovereign act of a foreign state." *Id.* at 1358. The Act of State Doctrine was not repealed or limited by the passage of the Foreign Sovereign Immunities Act, *Id.* at 1359, and since the Act of State Doctrine has "constitutional underpinnings," *see Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 423, 84 S.Ct. 923, 937, 11 L.Ed.2d 804 (1964), it appears that Congress would have lacked the authority to limit the doctrine. In fact, Congress purposefully avoided any abrogation of the Act of State Doctrine in its passage of the Foreign Sovereign Immunities Act, and it is clear that the Act of State Doctrine remains vital. *See International Assn. of Machinists, supra,* 649 F.2d at 1359.

Nor does Congress' recognition of the "commercial activity" exception in a sovereign immunity context dilute the Act of State Doctrine where it applies. *Id.* at 1360. In some instances both the "commercial activity" exception to sovereign immunity *and* the Act of State Doctrine will apply; in those cases, dismissal of the suit is nevertheless necessary:

The act of state doctrine is not diluted by the commercial activity exception which limits the doctrine of sovereign immunity. While purely commercial activity may not rise to the level of an act of state, certain seemingly commercial activity will trigger act of state considerations . . . . While the [Foreign Sovereign Immunities Act] ignores the underlying purpose of a state's action, the act of state doctrine does not. This court has stated that the motivations of the sovereign must be examined for a public interest basis. [Citation omitted] When the state *qua* state acts in the public interest, its sovereignty is asserted. The courts must proceed cautiously to avoid an affront to that sovereignty. *Because the act of state doctrine and the doctrine of sovereign immunity address different concerns and apply in different circumstances, we find that the act of state doctrine remains available where such caution is appropriate, regardless of any*

*commercial component of the activity involved.*

*Intern. Assn. of Machinists v. OPEC, supra,* 649 F.2d at 1360. (Emphasis added; footnote omitted).

The issue in this case, then, is whether, assuming some commercial component in Bangladesh's regulation of wildlife within its borders, Bangladesh has acted "in the public interest," so as to assert its sovereignty. If so, the Act of State Doctrine requires dismissal.

DISCUSSION

A. Bangladesh is Immune From Suit Under the Facts of This Case

Under 28 U.S.C. § 1605(a)(2), clause 3, I am required to determine whether Bangladesh's issuance of a License for the capture and export of rhesus monkeys constituted "commercial activity." The definition of "commercial activity" for purposes of the FSIA, previously quoted, requires that this determination turn upon "the nature" of the activity, rather than its purpose. 28 U.S.C. § 1603(d). The legislative history of the FSIA indicates that the classification of particular activities was intentionally avoided by Congress, which left this problem to development by the courts on a case-by-case basis. *See* H.R.Rep. No. 94–1487, 94th Cong., 2nd Sess., at p. 16 *reprinted in* [1976] *U.S.Code Cong. and Admin.News,* 6604, 6615.

■ I conclude that Bangladesh's granting of the License to plaintiff in this case was not a "commercial activity," but a sovereign act not subject to suit in United States courts. The granting of such a license as part of a comprehensive regulation of wildlife under the police power is an action in which the sovereign power is essential. Likewise the granting of an export license, like the power to exclude imports or regulate exports in general, is a *power* possessed only by sovereigns, not private parties. I find that the activity in suit here is by its "nature" sovereign activity.

The plaintiff argues that the purpose of the License was to generate revenue for Bangladesh, and thus the License is of a commercial nature. The *purpose* of the activity is irrelevant under the statute. 28 U.S.C. § 1603(d). If I were allowed to consider the purpose of the activity, it would clearly indicate that the activity was based upon the "public interest" as perceived by the government of Bangladesh, to conserve wildlife and establish closer control over the exportation of Bangladeshi species. This is true even if Bangladesh receives revenue from the License. The power to tax, or the power to levy a duty upon exports or imports, is a sovereign function designed solely to bolster the fisc by generating state income; yet these activities do not thereby become "commercial." Even if Bangladesh's sole purpose in entering into the License was to generate revenue (and the record reveals other goals, including the conservation of wildlife and the meeting of a demand for humanitarian purposes), the granting of the License in this case was not a commercial activity.

■ However, the purpose of the activity, as opposed to its "nature," is not relevant for immunity purposes. The "nature" of the activity in suit is the regulation of wildlife. This is a sovereign activity not subject to challenge in foreign courts.

The plaintiff also argues that the rhesus monkeys in suit are *ferae naturae,* and thus Bangladesh has merely engaged in activity which any landowner might engage in, by allowing private parties to hunt upon private land. This argument is inventive, but I reject it. The doctrine has never applied to primates and I doubt that it applies here. More importantly, even assuming that the doctrine applied to the area and superseded local customary law, such a doctrine has clearly been displaced by the sovereign actions of Bangladesh in regulating the taking and exporting of wildlife within its borders. Indeed, if the monkeys in suit were really *ferae naturae,* plaintiff had no need for a license to take them and has not been harmed by Bangladesh's cancellation of that license. Plaintiff need only secure permission of individual landowners in order to proceed with its activities. Plaintiff's argument ignores the fact that Ban-

gladesh also granted an *export* license in the Licensing Agreement, which is obviously a governmental, not a proprietary act.

The plaintiff also argues that Bangladesh's action is merely that of an individual landowner, and thus "commercial." The power to regulate the taking of game upon land owned by the landowner is an aspect of sovereignty, attached to land and derived from feudal precedent, which is subordinate to the State's overriding police power. It is clear that Bangladesh is acting as a sovereign in this case. As noted in *Intern. Assn. of Machinists v. OPEC*, 477 F.Supp. 553, 568 (C.D.Cal.1979), *aff'd on alternative grounds*, 649 F.2d 1354 (9th Cir.1981), *cert. denied*, 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982), "The control over a nation's natural resources stems from the nature of sovereignty. By necessity and by traditional recognition, each nation is its own master in respect to its physical attributes." The *OPEC* cases concerned an alleged price-fixing conspiracy entered into by the OPEC nations. The Court reasoned that even assuming that the price-fixing would be illegal if engaged in by private citizens, the sovereign state must often engage in regulation of a nation's natural resources. This is by its nature a sovereign function not subject to challenge in this suit.

My ruling is consistent with *Texas Trading v. Federal Republic of Nigeria*, 647 F.2d 300, 308–310 (2nd Cir.1981), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). There, the Second Circuit held that Nigeria was subject to suit for breach of contracts it entered into for the purchase of cement. The purpose of the purchases— economic development encouraged at state expense—was irrelevant under the Act. *Id.* at 647 F.2d 310. There were no sovereign capacities in issue in that case as anyone can order delivery of cement. The present suit, however, would require the court to "second guess" Bangladesh in the exercise of its sovereign function as regulator of wildlife. Such extraterritorial jurisdiction for United States courts over foreign sovereigns exercising their sovereignty is barred by the Act.

**B. This Suit is Barred by the Act of State Doctrine**

This action is also barred by the Act of State Doctrine, *see IAM v. OPEC* at 649 F.2d 1358–1362, because resolution of this suit would require the court to "adjudicate a politically sensitive dispute which would require the court to judge the legality of the sovereign act of a foreign state." *Id.* at 1358. In considering the application of the Act of State Doctrine, I must assess the purpose of the governmental action at issue—an inquiry which is not relevant under the FSIA. *Id.* at 1360. "When the state *qua* state acts in the public interest, its sovereignty is asserted." *Id.* It is clear in this case that Bangladesh has acted to regulate wildlife within its borders for the purpose of aiding "the public interest" of its citizens. That regulation is a sovereign act which this suit would overturn. Such second-guessing of the sovereign is barred by the Act of State Doctrine. *Id.*

Also relevant in applying the Act of State Doctrine are "the availability of internationally-accepted legal principles which would render the issues appropriate for judicial disposition," and the suit's "potential for interference with our foreign relations." *Id.* at 1360–1361. Consideration of these factors also weighs in favor of the application of the Act of State Doctrine to bar this action.

There is no internationally-accepted legal principle to which all states adhere in regulating their wildlife. Such regulation is a function of public and private pressures, relative wealth, climate, and population densities which compete for resources. This court has no expertise in the area of the proper regulation of the wildlife of Bangladesh. No court does. There are no "issues appropriate for judicial disposition." *Id.* at 1361.

Consideration of the effect this suit might have on our foreign relations warrants application of the Act of State Doctrine.

The political branches of our government are able to consider the competing eco-

nomic and political considerations and respond to the public will in order to carry on foreign relations in accordance with the best interests of the country as a whole. The courts, in contrast, focus on single disputes and make decisions on the basis of legal principles. The timing of our decisions is largely a result of our caseload and of the random tactical considerations which motivate parties to bring lawsuits and to seek delay or expedition. When the courts engage in piecemeal adjudication of the legality of the sovereign acts of states, they risk disruption of our country's international diplomacy. The executive may utilize protocol, economic sanction, compromise, delay, and persuasion to achieve international objectives. Ill-timed judicial decisions challenging the acts of foreign states could nullify these tools and embarrass the United States in the eyes of the world.

*Id.* at 1358.

Resolution of the merits of the controversy could "risk disruption of our country's international diplomacy" and could "embarrass the United States in the eyes of the world."

The entertaining of this suit could give rise to charges of colonialist bias in third world countries. The United States would not surrender its sovereign power over wildlife within its borders to the decisions of another government. The entertaining of such a suit seeking the reverse could give rise to diplomatically embarrassing charges of a double standard in international sovereignty. Plaintiff seeks $15 million in damages for the breach of Bangladesh's agreement to license the plaintiff. Assuming

that such damages could be proved to the satisfaction of the court—a question which, in light of my disposition of this case, I need not decide, *see* 28 U.S.C. § 1608(e), Wright, Miller, and Kane, *Federal Practice and Procedure,* Civil 2d, § 2688 (ed. 1983)—such a ruling would require that I overturn Bangladesh's own view of its public interest in wildlife management. Further, in order to ascertain the damages it would be necessary for the court to decide whether plaintiff complied with the Agreement in regard to the "breeding farm" as well as the use of the monkeys. Bangladesh takes the position that delivery of the animals to the Armed Forces Radiobiology Research Institute at Bethesda, Maryland, where they were used in radiobiological research, violated the requirement that the monkeys be used "exclusively ... for the general benefit of all peoples of the world." A ruling on whether or not radiobiological research is or is not for the general benefit of all peoples of the world will "embarrass the United States in the eyes of the world." *IAM v. OPEC, supra,* at 649 F.2d 1358.

My review of the above facts convinces me that the Act of State Doctrine applies to bar this action.

CONCLUSION

I lack jurisdiction over this action. This action is also barred by the Act of State Doctrine. The plaintiff's motion for a default judgment will be denied, and the action dismissed.[1]

---

1. Plaintiff objected to the filing of a brief by *amicus curiae.* While the *amicus* here arguably lacks the stake in the controversy which might be required by principles of "standing" or intervention under Fed.R.Civ.Pro. 24, such is not required for the filing of an *amicus* brief. *Henderson v. International Union of Op. Eng.,* 420 F.2d 802, 806 n. 2 (9th Cir.1969); *EEOC v. Local Union No. 3,* 416 F.Supp. 728, 732 (N.D. Cal.1975). An *amicus* need not have any particular stake in a controversy, and serves merely to inform the court of applicable precedent or of considerations of the public interest. The

participation of such an *amicus* is often helpful in cases such as this one, where one party is unrepresented, yet the court has a duty under the law to consider that party's interest. 28 U.S.C. § 1608(e); *see Strasser v. Doorley,* 432 F.2d 567, 569 (1st Cir.1970); *Alexander v. Hall,* 64 F.R.D. 152, 155 (D.S.C.1974). I find that *amicus* filings have been useful and direct that they form part of the record in this case. Of course, the disposition of this case has turned upon issues of jurisdiction and prudential considerations which this court would be obliged to notice on its own motion.