**Larry RISK, Plaintiff,**

v.

**KINGDOM OF NORWAY, et al., Defendants.**

No. C–88–1435–WWS.

United States District Court, N.D. California.

March 2, 1989.

children, brings this action against the Kingdom of Norway ("Norway"), the Norwegian Seaman's Mission ("Mission"), and five individuals, including his wife, Elisabeth Antonsen Risk, and Jacob Frode Knudsen ("Knudsen"), a religious minister employed by the Mission, arising out of the removal of Risk's children from California in violation of a temporary custody order of the San Francisco Superior Court.[1] On his behalf Risk alleges interference with his parental relationship with his children, intentional infliction of emotional distress, and conspiracy by the defendants to remove the children from California. On behalf of his children he alleges interference with their right to parental consortium.

Defendants have made the following motions: (1) a motion by Norway, the Mission, and Knudsen to dismiss the claims against them for lack of subject matter jurisdiction; (2) a motion by Norway, the Mission, and Knudsen to dismiss the action by Larry Risk for himself and as guardian *ad litem* on the ground of the act of state doctrine; (3) a motion by Norway, the Mission, and Knudsen to dismiss the claims by Larry Risk on the ground that the limitations period has run; (4) a motion by the Mission and Knudsen to disqualify Larry Risk as guardian *ad litem* for his children; and (5) a motion by Knudsen to dismiss for failure to state a claim against him.

Dennis P. Riordan, Riordan & Rosenthal, Marvin Stender, McTernan, Stender, Walsh & Schwartzbach, San Francisco, Cal., for plaintiff.

John R. McDonough, Ball, Hunt, Hart, Brown & Baerwitz, Los Angeles, Cal., Michael Traynor, Cooley, Godward, Castro, Huddleson & Tatum, San Francisco, Cal., for defendants.

## MEMORANDUM OF DECISION AND ORDER

SCHWARZER, District Judge.

Plaintiff Larry Risk, suing individually and as guardian *ad litem* for his two minor

### I. *Factual Background*

In July 1983 the Risk family—Larry Risk, Elisabeth Antonsen Risk and their children Karima and Jamil Risk—left the United States to live in Norway for a year. (Norway's Exh. 4, translation of decision of Norwegian Supreme Court, at 1.) Later that year, after an attempt by Larry Risk to take the children back to the United States while Elisabeth Risk was hospitalized, Elisabeth Risk requested and received a temporary custody order from a Norwegian County Court. (*Id.*) That order gave Larry Risk "ordinary visitation rights." (*Id.*)

1. Two consular officials have been previously    dismissed on the ground of consular immunity.

During the first visitation period, Larry Risk took the children and returned with them to the United States. (*Id.* at 1–2.)

Elisabeth Risk then returned to the United States and filed a petition in the Superior Court for the City and County of San Francisco ("San Francisco Superior Court") seeking custody of the children. (Complaint at ¶ 12.) In January 1984, Elisabeth and Larry Risk were awarded joint custody of the children. (Risk's Joint Response, Ex. A, Order of San Francisco Superior Court, at 1–2.) The custody order barred the Risks from removing the children from the Bay Area, required them to surrender their passports and those of their children to Larry Risk's counsel, and forbade them from "applying for, obtaining, or directing any other party to apply for on behalf of either party or the minor children a passport ... without prior order of a California Court." (*Id.* at 2–3.)

In July 1984, Elisabeth Risk took the children and returned to Norway.

In April 1988, Larry Risk filed this action. His complaint alleges that an agent of the Mission contacted officials of the Norwegian consulate, that these officials provided Elisabeth Risk with funds for traveling to Norway and with traveling papers for herself and the children, all under Elisabeth's maiden name. (Complaint at ¶¶ 16–18.) It further alleges that defendant Knudsen, an official in the Norwegian Seamen's Church, covered up Elisabeth's flight, and that when Larry Risk went to Norway in an attempt to locate his children, the Norwegian government frustrated his efforts. (Complaint at ¶¶ 17–23.) Finally, it alleges an agreement between the Norwegian government and Elisabeth Risk to inform her if Larry Risk arrives in Norway and to assist her "in assuring that Larry Risk will not be able to locate her or

his children while he is in Norway." (Complaint at ¶ 23.)

Elisabeth Risk and the children remain in Norway, and she has not appeared in this action.

## II. *Subject Matter Jurisdiction*

Defendants contend that the Court lacks subject matter jurisdiction (1) over the claim on behalf of the Risk children because of lack of diversity under 28 United States Code section 1332(a), and (2) over the entire action by Larry Risk for himself and as guardian *ad litem* for the Risk children on the ground of sovereign immunity.

### A. Diversity jurisdiction over the Risk children's claim

Larry Risk alleges that the Risk children are citizens of California and the United States. (Complaint at ¶ 8.) The Mission and Norway, however, have produced evidence, including a decision of the Norwegian Supreme Court, that the children are also Norwegian citizens. (*See* Norway's Motion to Dismiss, Ex. 3 at 1.) On the basis of that evidence, defendants contend that, regardless of the children's California citizenship, their Norwegian citizenship defeats diversity jurisdiction under 28 United States Code section 1332(a)(2) because all defendants are Norwegian citizens.[2]

This appears to be an issue of first impression. Other courts have, however, addressed the analogous situation of a plaintiff, who is a citizen of a state of the United States, asserting dual foreign citizenship to create diversity. Courts have reached different results in that situation. In *Aguirre v. Nagel,* 270 F.Supp. 535, 536 (E.D.Mich.1967), the district court stated that it did not "deem it good law to deny

---

**2.** Rather than relying on lack of diversity, Norway contends that under *De Sanchez v. Banco Central de Nicaragua,* 770 F.2d 1385 (5th Cir. 1985), the Court should not exercise jurisdiction over a dispute between a state and its national. In *De Sanchez,* a Nicaraguan plaintiff brought suit against a Nicaraguan bank; the Fifth Circuit held that it should not intervene in a dispute between a state and its national where the bank's actions did not violate human rights or

"call into question the territorial sovereignty of the United States." 770 F.2d at 1397–98. *De Sanchez* is distinguishable; Norway, as discussed below, is alleged to have committed torts within the United States, and the Risk children are American as well as Norwegian citizens. Thus the United States has an interest in this dispute, which involves its citizens and acts within its territory.

the existence of jurisdiction under [28 United States Code section 1332(a) ] subsection (2) on the grounds of non-existence of jurisdiction under subsection (1)." *Aguirre* has been criticized by commentators as inconsistent both with the principle of complete diversity, 1 *Moore's Federal Practice,* ¶ 0.75[1.–1] at 709.4–.5 (1986); 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3621 at 581–82 (2d ed. 1984), and with the rationale of avoiding bias against out-of-state residents underlying diversity jurisdiction, 13B C. Wright, A. Miller & E. Cooper at 582. Subsequent courts have not followed *Aguirre. Sadat v. Mertes,* 615 F.2d 1176 (7th Cir. 1980); *Nazareth Candy Co. v. Sherwood Group, Inc.,* 683 F.Supp. 539 (M.D.N.C. 1988); *Raphael v. Hertzberg,* 470 F.Supp. 984, 986 (C.D.Cal.1979), *appeal dismissed,* 636 F.2d 1227 (9th Cir.1980). For example, in *Raphael* the court, relying on the requirement of complete diversity and noting the inequities that would result if dual citizens had greater access to the courts than do solely United States citizens, stated that there was no jurisdiction over a claim against California defendants by a "dual national" residing in California.[3] 470 F.Supp. at 986.

In *Sadat v. Mertes,* the Seventh Circuit addressed a slightly different situation. Plaintiff was an American citizen residing in Egypt and therefore not a citizen of any state for purposes of jurisdiction under section 1332(a)(1). 615 F.2d at 1182. He sued other American citizens for damages suffered in an auto accident in the United States, asserting alienage jurisdiction as an Egyptian citizen. *Id.* The defendants denied that he was an Egyptian citizen, but

argued that even if he were, that citizenship should be disregarded for purposes of section 1332(a)(2). The Seventh Circuit held, basing its decision on a concern for uniform treatment and on the principles underlying diversity jurisdiction, that there was no jurisdiction over his claim against other American citizens. 615 F.2d at 1188. First, it reasoned that dual nationality should not give a citizen a right not given similarly situated solely United States citizens. *Id.* at 1185–86, 1188. Second, it stated that, despite plaintiff's dual nationality, the foreign nation would be unlikely to complain about a state court's treatment of him, particularly if his dominant nationality was American. *Id.* at 1186–1188. And, finally, it saw little reason to fear local bias if the plaintiff, as a resident of that state, is forced into state court. *Id.* at 1186 n. 13.

The instant case differs from those previously decided in that it is the defendant who is relying on plaintiff's foreign citizenship to defeat diversity, rather than the plaintiff who is relying on it to create diversity.

Notwithstanding that difference, the principles developed in those cases are relevant. Those principles are uniformity of treatment of dual and solely United States citizens, the requirement of complete diversity,[4] and the need to protect foreign citizens against bias in state court and to avoid friction with foreign nations.

In the instant case, these principles are in tension. Denying jurisdiction would deny the children, because they are dual citizens, access to the court they would otherwise have as California citizens, while giving them access would violate the re-

---

**3.** In *Raphael,* the court held that there was no diversity because plaintiff was solely a United States citizen, but then went on to accept for purposes of argument plaintiff's claim to dual nationality, and discussed the result under that theory. The district court also based its decision on the "ever rising level of criticism of the very concept of diversity jurisdiction." However, as the Seventh Circuit noted, "not even the proponents of the abolition of diversity jurisdiction over suits between citizens of the several United States have advocated elimination of alienage jurisdiction." *Sadat v. Mertes,* 615 F.2d 1176, 1182 (7th Cir.1980).

**4.** The principle of complete diversity stems from the decision in *Strawbridge v. Curtiss,* 7 U.S. 267, 3 Cranch 267, 2 L.Ed. 435 (1806). It has been applied to a number of different situations. *See, e.g., Local Union 598 v. J.A. Jones Constr. Co.,* 846 F.2d 1213, 1215 (9th Cir.), *aff'd,* — U.S. ——, 109 S.Ct. 210, 102 L.Ed.2d 202 (1988) (complete diversity required for case to be removed on diversity of citizenship grounds); *Munoz v. Small Business Admin.,* 644 F.2d 1361, 1366 (9th Cir.1981) (refusing to exercise pendent party jurisdiction, in part because to do so would effectively overrule the complete diversity requirement in *Strawbridge* ).

quirement of complete diversity since Norwegian citizens would be suing each other. With these two factors cancelling each other out, what is decisive is that the Risk children, as California residents, need not fear local bias and Norway, recognizing the children's dual citizenship, is unlikely to complain of their treatment by a state court. Since the factors that counsel against asserting jurisdiction predominate, the claim of the Risk children must be dismissed.[5]

## B. Foreign Sovereign Immunity

Larry Risk asserts that the Court has jurisdiction of his claims against Norway under the Foreign Sovereign Immunity Act of 1976 ("FSIA"),[6] which provides that "the district courts shall have original jurisdiction ... of any nonjury civil action against a foreign state ... as to any claim for relief in personam with respect to which the foreign state is not entitled to relief either under sections 1605–1607 of this title or under any applicable international agreement." 28 U.S.C. § 1330(a). Risk also asserts that the Court has jurisdiction over his claims against the Mission as an "agency or instrumentality" of Norway (Complaint at ¶ 5) or on the basis of diversity (*id.* at ¶ 8).

### 1. *Jurisdiction Over Norway*

Norway contends that it is entitled to immunity (1) on all claims because it did not commit any torts within the United States; (2) on the claims asserted on behalf of the Risk children because any damage suffered by the Risk children would have occurred in Norway; and (3) on all the claims because its actions involved the performance of discretionary functions. It also contends that because the Risk children are Norwegian citizens, this dispute should be resolved in Norway. Risk contends that (1) Norway is subject to the jurisdiction of this Court on the claims by both Risk and the Risk children because it committed torts within the United States; (2) Norway has not shown that it delegated

to its consular officers discretion broad enough to encompass the acts Risk has alleged; and (3) the discretionary function exception under the FSIA does not apply to illegal acts.

### a. Commission of Acts Within the United States

The FSIA provides that a foreign state is not immune from suits for money damages for "personal injury or death, or damage to or loss of property, *occurring in the United States*." 28 U.S.C. § 1605(a)(5) (emphasis added).

The torts Norway is alleged to have committed are interference with Larry Risk's relationship with his children (Complaint at ¶¶ 11–28), conspiracy to interfere with that relationship (*id.* at ¶¶ 29–32), intentional infliction of emotional distress (*id.* at ¶¶ 33–36), and interference with the Risk children's relationship with their father (*id.* at ¶¶ 37–39). These torts are based upon allegations that Norway's agents advised Elisabeth Risk to take the children back to Norway, and issued her travel documents and funds to do so; supplied her with funds for legal fees in connection with the California custody proceedings; declined to respond to Larry Risk's inquiries about the children and to requests to help him in locating the children in Norway; advised Elisabeth Risk of Larry Risk's arrival in Norway; helped her hide the children; and entered into an agreement with her to help her hide the children on any subsequent visits by Larry Risk.

In *Olsen by Sheldon v. Government of Mexico*, the Ninth Circuit rejected the rule that all the tortious conduct complained of must occur in the United States for the federal court to have jurisdiction under section 1605(a)(5). 729 F.2d 641, 646 (9th Cir.), *cert. denied*, 469 U.S. 917, 105 S.Ct. 295, 83 L.Ed.2d 230 (1984). There children had brought suit against Mexico for the wrongful death of their parents in an airplane crash which occurred on United States ter-

---

**5.** It is therefore unnecessary to reach the motion to disqualify Larry Risk as guardian *ad litem* for the Risk children.

**6.** Pub.L. No. 94–583 90 Stat. 2891–92, 2894–98 (1976), *codified at* 28 U.S.C. §§ 1330, 1332(a)(2), (4), 1391(f), 1441(d), 1602–1611.

ritory during an attempt to land a plane at Tijuana. The Ninth Circuit held that "if plaintiffs allege at least one entire tort occurring in the United States, they may claim under section 1605(a)(5)." *Id.* at 646.

■ Larry Risk alleges actions by Norwegian officials in the United States—conspiring with Elisabeth Risk, giving her advice, issuing her papers, and providing her with funds to travel to Norway—that violate Risk's right to maintain a parental relationship with his children. This tort, as alleged, as well as the torts of intentional infliction of emotional distress and of interfering with the Risk children's relationship with their father, occurred in the United States, and thus brings the case within section 1605(a)(5).[7]

b. Discretionary function exception

Section 1605(a)(5) of the FSIA creates an exception from liability for claims based upon the exercise or performance, or failure to exercise or perform, a discretionary function.[8] Application of the discretionary function exception is controlled by the principles developed under the Federal Tort Claims Act ("FTCA"). *Joseph v. Office of Consulate General of Nigeria*, 830 F.2d 1018, 1026 (9th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1077, 99 L.Ed.2d 236 (1988); H.R.Rep. No. 94–1487, 94th Cong., 2d Sess. 21, *reprinted in* 1976 U.S.Code Cong. & Admin. News 6604, 6620 (exceptions to section 1605(a)(5) "correspond to many of the claims with respect to which the U.S. Government retains immunity under the Federal Tort Claims Act, 28 U.S.C.

§ 2680(a) and (h)"). Thus, under the FSIA, as under the FTCA, "it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies." *United States v. Varig Airlines*, 467 U.S. 797, 813, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984). The Court must refrain from " 'second-guessing' ... decisions grounded in social, economic, and political policy." *Id.* at 814, 104 S.Ct. at 2765.

The issuance of identification documents is a function recognized as being among the powers exercised by consular officials by the Vienna Convention on Consular Relations. Vienna Convention on Consular Relations, April 24, 1963, art. 5(d) (consular functions). Even if the officials abused their power, its exercise remains within their discretion. While other consular functions authorized by the Vienna Convention are subject to the limitation that they may not violate the law of the receiving state, the issuance of travel documents is not so limited. *Id.* Moreover, issuing travel papers to one's nationals, including in this case the related acts of giving them funds with which to travel, along with advice, is a decision governed by considerations of social policy, and therefore within the discretionary function exception.

The central issue here is whether the discretionary function exception applies to acts that violate the domestic law of the United States. Risk argues that because a conspiracy to remove a child from the parent having custody is a crime,[9] the discre-

---

7. That the children may have suffered damage from these torts while in Norway does not affect this conclusion.

8. 28 U.S.C. § 1605(a)(5) provides in part that a foreign state is not

immune from the jurisdiction of courts of the United States ... in any case—

\* \* \* \* \* \*

(5) [I]n which money damages are sought against a foreign state for personal injury or death ... occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except that this paragraph shall not apply to—

(A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused....

9. The intentional violation of one parent's custody rights by another is a crime in California. Cal.Penal Code § 278.5 (West 1988). Norway argues that Larry Risk has not alleged a violation of Penal Code section 278.5 because the complaint alleges only knowledge of the pending case and the temporary custody order, not knowledge of Risk's custody and visitation rights. (Norway's Reply at 8, n. 5.) However, violation of an interim custody order also violates section 278.5. *See People v. Beach*, 194 Cal.App.3d 955, 970–71, 240 Cal.Rptr. 50, 58 (4th Dist.1987).

tionary function exception should not apply. Risk relies on cases excluding criminal acts from the discretionary function exception. *Gerritsen v. de la Madrid Hurtado,* 819 F.2d 1511, 1518 (9th Cir.1987) (alleged assault with deadly weapon and kidnapping and interrogation of protester not discretionary); *Liu v. Republic of China,* 642 F.Supp. 297, 305 (N.D.Cal.1986) (killing United States citizen not a policy option available to foreign countries); *Letelier v. Republic of Chile,* 488 F.Supp. 665, 673 (D.D.C.1980) (no discretion to order or aid in assassination).

■ It does not follow, however, that every act which may have criminal consequences falls outside the discretionary function exception. In *MacArthur Area Citizens Ass'n v. Republic of Peru,* 809 F.2d 918 (D.C.Cir.1987), *modified,* 823 F.2d 606 (D.C.Cir.1987), the court stated that "the legislative history counsels that the [tortious act] exception should be narrowly construed...." *Id.* at 921.[10] In that case the court held that the exception covered the conversion of a building to serve as a chancery, although it arguably was a criminal violation of zoning regulations. In dictum the court observed:

> Moreover, it is hardly clear that, even if a criminal act were shown, it would automatically prevent designation of Peru's acts as discretionary. The cases on which appellant relies involve criminal acts of a rather different character and order. *See, e.g., Letelier,* 488 F.Supp. at 673 (involving "assassination of an individual or individuals, action that is clearly contrary to the precepts of humanity as recognized in both national and international law"). We think it not unduly bold to conclude that violations, if any, of a zoning ordinance do not rise to the level of actions *malum in se.*

809 F.2d at 922 n. 4.

In *Joseph v. Office of Consulate General of Nigeria,* the Ninth Circuit distinguished *MacArthur* and declined to apply the discretionary function exception to the removal of property from and damage to leased premises. 830 F.2d 1018, 1026–27 (9th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1077, 99 L.Ed.2d 236 (1988). The court said that, unlike the conversion of a building into a chancery, destruction of property cannot be considered as part of a policy decision, and that exercise of jurisdiction would not encroach on the foreign sovereign's ability to make policy decisions.

■ The decision to assist in the repatriation of a national is a decision of a different character and order than those held to be non-discretionary. A sovereign's issuance of travel document and funds to its citizens, and taking other actions in aid of its citizens' interests, are policy decisions, based on social, legal, and perhaps political considerations. Just as the decision to place bars on windows and install floodlights is part of a policy decision regarding the appearance and security of the Peruvian chancery, *see MacArthur Area Citizens Ass'n,* 809 F.2d at 922, the decision to assist the Risk children in returning to Norway implements Norway's policies concerning the protection of its citizens.

In addition, unlike the property destruction in *Joseph,* exercising jurisdiction in this case would encroach on Norway's ability to make policy decisions about its nationals. That those decisions may conflict with decisions made by a California court does not render them any less entitled to the immunity under the FSIA.

Drawing the line between immune and non-immune acts violating the law of another state will rarely be an easy task. As the court in *MacArthur* said, the Court must look at the character and order of the conduct involved. 809 F.2d at 922 n. 4. Customary standards of human conduct reject the implementation of policy by assault and battery. *See Gerritsen,* 819 F.2d at

---

**10.** The purpose of the discretionary function exception under the FTCA, like that under the FSIA, is to avoid interference with governmental policymaking. In applying the exception under the FSIA, however, the courts must consider the additional risk of interfering with foreign relations. As a result there is reason to construe the exclusion of criminal acts from the discretionary function exception more narrowly under the FSIA than under the FTCA, and hence give the discretionary function exception wider scope.

1518.[11] But attaching the label of kidnapping to the conduct at issue is not sufficient to overcome the policy attributes of Norway's decision to aid its nationals in conformity with its own laws, regardless of the resulting conflict with California law.

Accordingly, the acts of Norway's officials are entitled to immunity under the FSIA.

### 2. *Jurisdiction over the Mission*

■ Risk alleges that the Mission is a citizen of Norway. (Complaint at ¶ 8.) On the face of the complaint, therefore, the Court has subject matter jurisdiction of the claim against the Mission, a foreign citizen, under 28 United States Code section 1332(a)(2). Because the Mission is not an "agency or instrumentality" of the Norwegian government, as defined by the FSIA,[12] *see* 28 U.S.C. § 1603(b), it is not entitled to claim sovereign immunity.

### III. *Act of State Doctrine*

Defendants Norway and the Mission move to dismiss the claims against them under the act of state doctrine. Knudsen joins in this motion.

The traditional formulation of the act of state doctrine is that "the courts of one country will not sit in judgment on the acts of the government of another done within its own territory." *Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897) *quoted with approval in Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 416, 84 S.Ct. 923, 934, 11 L.Ed.2d 804 (1963). The purpose of the doctrine is to "keep the judiciary from embroiling the courts and the country in the affairs of the foreign nation whose acts are challenged." *Republic of the Philippines v. Marcos,* 862 F.2d 1355, 1360 (9th Cir. 1988) (*en banc*); *see Sabbatino,* 376 U.S. at 421–424, 84 S.Ct. at 936–38 (act of state doctrine is not compelled by the constitu-

tion, by international law, or by the nature of sovereignty, but rather derives from judicial concern with possible interference with the political branches' conduct of foreign affairs).

Even where jurisdiction exists under the FSIA, the act of state doctrine applies if the action would require the court to "question the legality of the sovereign acts of foreign states." *International Ass'n of Machinists v. OPEC,* 649 F.2d 1354, 1359–60 (9th Cir.1981), *cert. denied,* 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982) (dismissing case which would require passing on legality of OPEC's pricing scheme); *see also Callejo v. Bancomer, S.A.,* 764 F.2d 1101, 1113 n. 2 (5th Cir.1985) (because act of state doctrine is grounded in prudential considerations, rather than on the doctrine of sovereign immunity, passage of the FSIA does not supersede the act of state doctrine); *MOL, Inc. v. Peoples Republic of Bangladesh,* 572 F.Supp. 79 (D.Or.1983), *aff'd on other grounds,* 736 F.2d 1326, *cert. denied,* 469 U.S. 1037, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984).

Because the Court does not have jurisdiction over Norway, the application of the act of state doctrine to it need not be addressed. The Mission and Knudsen, however, also claim that because resolution of this action would require a determination by this Court of the legality of Norway's acts within the United States and Norway, the act of state doctrine requires that this action be dismissed.

■ The act of state doctrine may apply even where no foreign sovereign is a named defendant, if the validity of acts of that sovereign will be passed on by the court. *See, e.g., Hunt v. Mobil Oil Corp.,* 550 F.2d 68, 75–78 (2d Cir.), *cert. denied,* 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977) (refusing to hear suit by independent oil producer against the major oil producers

---

**11.** *Gerritsen* relied on the distinction between planning and operational conduct in applying the discretionary function exception; this distinction was rejected by the Supreme Court in *Varig,* 467 U.S. at 813, 104 S.Ct. at 2764.

**12.** The Mission's papers show that it is funded by a combination of private contributions, church collections, and government subsidies; that it is run by an independent board, not the Norwegian government, and that its primary function is to provide a "religious, cultural and hospitality retreat" for Norwegian seamen and travelers. (Affidavit of Helge Petterson at ¶¶ 2–3.)

because it would require inquiry into Libya's motivation for nationalizing the plaintiff's assets); *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.*, 331 F.Supp. 92, 103–04 (C.D.Cal.1971) (dismissal of action which would require decision on boundary dispute between two foreign sovereigns), *aff'd per curiam*, 461 F.2d 1261 (9th Cir.), *cert. denied*, 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972) (cited with approval in *Marcos*, 862 F.2d at 1360). But, the doctrine applies only to acts of a foreign sovereign within its own territory. *See, e.g., Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 416, 84 S.Ct. 923, 934, 11 L.Ed.2d 804 (1964) (refusing to examine Cuban nationalization of holdings of American citizens where there was no treaty or other unambiguous international agreement to supply legal principles); *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897) (stating "the courts of one country will not sit in judgment on the acts of the government of another done within its own territory," and refusing to hear an action by an American citizen seeking damages stemming from acts committed by Venezuelan general immediately after taking the government by force).

In addition, the act of state doctrine is limited to cases of "sovereign activity effectuating 'public' rather than private interests." *Clayco Petroleum Corp. v. Occidental Petroleum Corp.*, 712 F.2d 404, 406 (9th Cir.1983), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984).

■ Thus, the Court may not inquire into the validity of sovereign actions of Norway, taken within Norway, which implicate Norway's public interest. It is clear that Norway's alleged acts in Norway implicate the public interest in the welfare of its citizens. The issue, then, is whether this action may proceed without necessitating an inquiry into those acts. *See Liu v. Republic of China*, 642 F.Supp. 297, 302–03 (N.D.Cal.1986) (refusing to dismiss case because resolution of it need not necessarily involve inquiry into the national security and intelligence affairs of the Republic of China).

Risk alleges a conspiracy entered into in the United States, to remove and conceal the Risk children, and acts by Norway and others to further that conspiracy within the United States. Though Norway is alleged to have frustrated Larry Risk's 1984 attempts in Norway to locate his children, Complaint at ¶¶ 22–23, and to have agreed to assist Elisabeth Risk similarly if Larry Risk returns to Norway, Complaint at ¶ 23, it is not necessary to inquire into those acts to adjudicate the conspiracy claim against the Mission and Knudsen.

■ The Mission also argues that, because officials in Norway may have approved the actions of Norwegian officials within the United States, the act of state doctrine applies to bar consideration of the actions of Norway within the United States. The logical result of accepting this argument would be to hold that any acts taken by Norwegian officials within the United States that are overseen by superiors in Norway would be immune. Such a holding would require drastic expansion of the act of state doctrine, beyond the traditional formulation of *Underhill*, and must be rejected.

Finally, the Mission argues that none of the cases focusing on the territorial nature of a sovereign's acts considered the application of the doctrine to consular acts alone committed within the United States. (Mission's Motion at 22 n. 6.) In substance, it argues for an extension of national territory to include consulates abroad.

■ Even if Norway's consulate were treated as its territory, application of the act of state doctrine to the claims against the Mission and Knudsen would not be appropriate. The purpose of the act of state doctrine is to avoid interference with the political branches; where the issue presented is unlikely to affect foreign relations, there is little justification for refusing to hear the case. *Sabbatino*, 376 U.S. at 423, 84 S.Ct. at 937–38; *Timberlane, Lumber Co. v. Bank of America*, 549 F.2d 597, 607 (9th Cir.1976). *Compare International Ass'n of Machinists* (named defendants were OPEC cartel members and challenged activity was OPEC pricing policy) *with Timberlane* (no need to dis-

miss case involving alleged conspiracy to force a lumber company out of business, where only involvement by foreign government was entry of court order in privately-initiated litigation, and foreign government not named as defendant). *See also Clayco Petroleum Corp.*, 712 F.2d 404, 406–07 (examining first whether sovereign acts implicated, then whether interference with the political branches' conduct of foreign policy would occur); *MOL, Inc.*, 572 F.Supp. at 84–86 (determining first that acts within Bangladesh were sovereign acts, then analyzing these two factors).

■ Although Norway is named as a co-conspirator, having been dismissed it will not be directly involved in this action. Norway faces no judgment against it and a decision on the conspiracy claim will not affect its foreign relations.

On the record presently before the Court, therefore, the motion of Mission and Knudsen to dismiss must be denied.

## IV. *Statute of Limitations*

Defendants contend that the limitations period has run on Larry Risk's claims. The parties agree that Risk's claims are governed by California Civil Procedure Code section 340.3, which provides that an action for personal injury must be brought within one year from the time the cause of action arises. Risk asserts three causes of action: for intentional infliction of emotional distress, for interference with his parental relationship with his children, and for conspiracy to interfere with this parental relationship.

■ The statute began to run on Risk's cause of action for intentional infliction of emotional distress once Risk's emotional distress reached the "severe" level. *Murphy v. Allstate Ins. Co.*, 83 Cal.App.3d 38, 51, 147 Cal.Rptr. 565, 575 (4th Dist. 1978); *Eisenberg v. Insurance Co. of North America*, 815 F.2d 1285, 1292 (9th Cir.1987). Risk has alleged "severe mental, emotional and physical distress and suffering" beginning in July 1984. (Complaint

¶ 34.) Ordinarily, where conduct complained of is continuing, the time at which "the defendant's conduct has become sufficiently outrageous and the plaintiff's emotional distress sufficiently severe for the plaintiff to state a cause of action will be questions of fact." *Murphy*, 83 Cal.App.3d at 51, 147 Cal.Rptr. 565. However, the act of taking Risk's children and continuing to keep them is not a course of conduct that only becomes outrageous over time, and Risk himself has alleged that the taking of the children inflicted "severe" emotional distress beginning in July 1984. This claim therefore is barred.

Risk's claims for interference with, and for conspiracy to interfere with, the parental relationship are based upon California Civil Code section 49, which provides that "[t]he rights of personal relations forbid ... [t]he abduction or enticement of a child from a parent." This section has been applied to bar both the unlawful taking of a minor child from custody and the unlawful withholding of the minor child from custody. *Surina v. Lucey*, 168 Cal.App.3d 539, 542, 214 Cal.Rptr. 509, 511 (2d Dist. 1985).

■ Generally, tort actions accrue when the wrongs alleged were committed and the resulting damages incurred. The tort of interfering with the parental relationship, however, is a continuing tort because it encompasses the withholding of a child from his or her parent's custody. *See Surina v. Lucey*, 168 Cal.App.3d at 542, 214 Cal.Rptr. at 511. Therefore, the statute of limitations has not run on this claim. *Cf. Leonhard v. United States*, 633 F.2d 599, 613 (2d Cir.1980) (applying principle that, at common law, claim for redress of continuing wrong does not accrue until date of last wrongful act to *Bivens* action based on removal of children from father).

■ Similarly, the statute of limitations does not begin to run on a conspiracy claim until the last overt act has been committed.[13] *Molko v. Holy Spirit Ass'n*, 46 Cal.

---

**13.** Under California law, a civil conspiracy is not itself a tort. *Wyatt v. Union Mortgage Co.*, 24 Cal.3d 773, 787 n. 4, 157 Cal.Rptr. 392, 400 n.

4 (1979). Liability is based on the underlying tort committed in furtherance of the conspiracy. *Id.* The applicable statute of limitations is the

3d 1092, 252 Cal.Rptr. 122, 762 P.2d 46 *modified,* 47 Cal.3d 470a (1988); *Wyatt v. Union Mortgage Co.,* 24 Cal.3d 773, 786, 157 Cal.Rptr. 392, 400, 598 P.2d 45 (1979). For an act to be an overt act delaying the commencement of the limitations period, it must be performed in furtherance of the conspiracy. *See Livett v. F.C. Financial Assoc.,* 124 Cal.App.3d 413, 419–21, 177 Cal.Rptr. 411, 414–15 (4th Dist.1981). Here, Risk has alleged a conspiracy to "harbor and conceal" the Risk children. Risk contends that Elisabeth Risk's retention of the children in Norway are acts in furtherance of that conspiracy. Accordingly, the statute of limitations on this claim has not run.

### V. *Motion to Dismiss Knudsen*

Knudsen moves to dismiss the claims against him on the ground that the allegations against him are insufficient to state a claim. Knudsen is named in the causes of action for interference with Larry Risk's parental relationship with his children, for intentional infliction of emotional distress, and for conspiracy to remove the children from California. Larry Risk does not oppose the dismissal of the claims for interference with his parental relationship with his children and for intentional infliction of emotional distress.

The second cause of action alleges that Knudsen participated in an ongoing conspiracy to "harbor and conceal" the children from Risk, Complaint at ¶ 30, in conscious disregard of Risk's custody rights, Complaint at ¶ 32. Risk also alleges that Knudsen "deliberately denied" knowing where the Risk children were, when in fact Knudsen knew that the Chief of Personnel of the Mission had traveled with Elisabeth Risk and the children out of California. (Complaint at ¶ 20.) A tortfeasor is liable, under a conspiracy theory, for all damages resulting to the plaintiff from acts done in furtherance of the shared objective of the conspiracy. 5 B. Witkin, *Summary of California Law,* Torts § 46 (9th ed. 1988).

These allegations suffice to permit Risk to prove facts at trial making Knudsen liable.

### VI. *Conclusion*

The claims on behalf of the Risk children are dismissed for lack of diversity jurisdiction. Risk's claims against Norway are dismissed for lack of subject matter jurisdiction under the FSIA. Risk's claim for intentional infliction of emotional distress is dismissed on the ground that it is barred by the statute of limitations. His claims against Knudsen for interference with the parental relationship and for intentional infliction of emotional distress are also dismissed. In all other respects, defendants' motions to dismiss are denied.

The only claims remaining are those against the Mission for conspiracy and interference with the parental relationship and the claim against Knudsen for conspiracy.

The Court will hold a status conference on April 14, 1989, at 10 a.m. to consider further proceedings.

IT IS SO ORDERED.

---

statute of limitations for the underlying tort. *See Maheu v. CBS, Inc.,* 201 Cal.App.3d 662, 247 Cal.Rptr. 304, 310 (2d Dist.1988); *Bedolla v.*

*Logan & Frazer,* 52 Cal.App.3d 118, 136, 125 Cal.Rptr. 59, 73 (1st Dist.1975).